546 So.2d 1241 (1989)
STATE of Louisiana
v.
Jimmy BRUMFIELD.
No. KA 88 1430.
Court of Appeal of Louisiana, First Circuit.
June 20, 1989.
Rehearing Denied August 17, 1989.
*1242 William R. Campbell, New Orleans, David J. Knight, Covington, for State.
James H. Looney, Covington, for Jimmy Brumfield.
Before CARTER, LANIER and LeBLANC, JJ.
LANIER, Judge.
Jimmy Brumfield (defendant) was indicted by the St. Tammany Parish Grand Jury for the second degree murder of Patricia Booker, a violation of La.R.S. 14:30.1. The defendant entered a plea of not guilty, and, at trial, the jury found the defendant guilty as charged. Subsequently, the trial court sentenced the defendant to the mandatory term of life imprisonment at hard labor, without benefit of probation, parole or suspension of sentence. This appeal followed.

FACTS
The instant offense occurred during the pre-dawn hours of December 9, 1987. The weather was cold and foggy.
At about 6:45 a.m. on December 9, the janitor at the Covington Curriculum Center (also known as Rosenwald School) in Covington, Louisiana, discovered the victim's body on the ground in front of one of the buildings at the Center. The victim was eighteen years old. She immediately summoned the assistance of Covington City Police Officer Melvin Crockett who went to the scene.
Beverly Jackson, Penny Brown and Robert Brown (who on the date in question operated a bar in Covington known as the High Chaparral)[1] all testified that they saw the victim and the defendant at the High Chaparral during the early morning hours of December 9, 1987. Diane Brown and Robert Brown testified that they saw the defendant and the victim talking to each other.
According to Diane Brown, while the defendant was talking to the victim, the defendant pulled money from his pocket and showed it to the victim. Diane Brown testified that she did not know what the defendant was saying to the victim but that the victim turned her head "like she was saying no or something." However, the defendant reacted by angrily leaving the bar.
Robert Brown testified that, when the defendant "started messing with [the victim] a little bit", he asked the defendant to leave her alone. The defendant complied for a few minutes before he "started back." Robert Brown testified that he again asked that the defendant leave the victim alone, and the defendant then complied. According to Robert Brown, the victim left the High Chaparral at about 3:30-4:00 a.m. The defendant remained in the bar. However, about four or five minutes later, he too left the bar.
Valerie West testified that she lives in Covington in the neighborhood of the Funky London. On December 9, at about 2:45 a.m., she was walking to a friend's house when she saw a man coming out of the Funky London. The man was on one side of the street, and she was on the opposite side when they apparently walked past each other. West stated that she then went to her friend's house. She remained there about fifteen minutes. West testified that, while she was coming out the back door of her friend's house, she saw the defendant and the victim standing "[a]t the corner by the school", "[b]y the big oak tree." According to West, the Covington Curriculum Center is located about two *1243 blocks from the Funky London. West testified that, because she had not taken a "good look" at the man she first observed who came out of the Funky London and walked past her, she "guess[ed]" that the man was the defendant. Nonetheless, she further testified that the defendant was the man she had seen the second time (with the victim) and that he was the same man who had first walked past her.
Deidra Pichon testified that she lives across the street from the Covington Curriculum Center. At about 3:00 a.m. on December 9, she heard a scream followed by another scream. She described the scream(s) as sounding like a woman's voice.
Charles Strickland testified that he resides in Covington and that he does not know the defendant. Strickland stated that, during the early morning hours of December 9, 1987, he got up to go purchase some cigarettes. As he was walking to The Corner (apparently a business establishment) at about 3:30-3:45 a.m., Strickland encountered a man who was carrying some clothes under his arms and was "in a bit of a hurry...." The man was coming from the direction of the Covington Curriculum Center, and he was not wearing a shirt, i.e., he was bare chested. Strickland testified that he asked the man if The Corner was open. The man replied in a stuttering voice that it was closed. Strickland then turned around and apparently began going home. Strickland testified that the weather was extremely foggy and that he did not know if the man was the defendant or someone else. Strickland observed the man proceed toward the Funky London, where he got into a two-tone truck and left the scene. Strickland stated that earlier he had seen the truck parked in front of the Funky London with a guy asleep inside the truck on the passenger side.
Jefferson Marks testified that he came into contact with the defendant at another bar at about 10:30 p.m. on December 8. Thereafter, at about midnight on December 9, he went to the Funky London with the defendant. At about 2:00 a.m., with the defendant's permission, Marks entered the defendant's truck, which was parked in front of the Funky London. Marks stated that he then slept in the truck until he later woke up. Marks did not know what time he woke up, but he did know that when he awoke he was still at the Funky London. Marks was "half asleep" when the defendant entered the truck to leave. Thereafter, the defendant brought Marks to Marks' home in Folsom, where they arrived at 5:00 a.m. According to Marks, it takes about thirty minutes to drive from the Funky London to his home in Folsom. Marks testified that he is a friend of the defendant and has known the defendant for fifteen years or longer and that the defendant stutters. Covington City Police Officer Robert Blunt, who talked to the defendant after the defendant's arrest, corroborated Marks' testimony that the defendant stutters.
Dr. Charles C. Crumpler was qualified by stipulation of the state and the defense and was accepted by the trial court as an expert in the field of forensic pathology. Dr. Crumpler testified that he performed an autopsy on the victim's body on December 9, 1987. His autopsy revealed that the victim had sustained forty-five stab wounds and that her death was caused by multiple stab wounds and the hemorrhage therefrom.
Covington City Police Officer Robert Blunt arrested the defendant with the assistance of officers of the Tangipahoa Parish Sheriff's Office near the defendant's residence in Uneedus on the afternoon of December 9. Following the defendant's arrest, the defendant gave the police consent to search his bedroom. Pursuant to that authorization, Officer Blunt returned to the defendant's home. At that time, the defendant's room was searched. Items seized during that search included state exhibit S-1, a freshly laundered gray shirt found on the defendant's bed, and state exhibit S-2, a knife recovered from a chest of drawers in the defendant's room.
George Schiro, who qualified and was accepted by the trial court as an expert in forensic serology, testified that he determined from a blood sample taken from the victim's body that she had ABO blood type *1244 A. Schiro determined from blood samples taken from the defendant and from Jefferson Marks that each of them had type O blood. Schiro examined and disassembled state exhibit S-2 (defendant's knife), and, beneath one of the wooden handles of the knife, he found human blood, ABO blood type A, matching the victim's blood type. Schiro examined state exhibit S-3 (defendant's underwear seized after his arrest) and found the presence of a weak and diffuse stain of human blood that could not be typed. However, when Schiro examined state exhibit S-4 (a pack of cigarettes seized from defendant's truck), he determined that there was human blood ABO blood type A on the pack.
Jefferson Marks and Charles Strickland each viewed state exhibits S-6A, S-6B and S-6C (photographs of defendant's two-tone pickup truck) at trial. Marks identified the truck depicted in the photographs as the defendant's truck, i.e., the truck which had been parked in front of the Funky London and in which he had slept on December 9. Strickland identified the truck depicted in the photographs as the one parked in front of the Funky London which the man he talked to on December 9 had entered.
Penny Brown identified state exhibit S-1 as the shirt the defendant had worn on December 9, 1987. Robert Brown viewed state exhibit S-1 and testified that the defendant had worn one "like it."
The defendant took the stand and testified in his own defense at trial. According to the defendant, he came in contact with Jefferson Marks at the Ponderosa (bar or lounge) on the night of December 8. Marks asked for a ride home. The defendant agreed to the request. As per their agreement, the defendant picked up Marks at the Rock Palace Lounge at about midnight. They then stopped at the Funky London to have a few beers. While there, the defendant gave Marks permission to sit inside his truck until they were ready to leave. Thereafter, the defendant left the Funky London and walked down to the Rock Palace Lounge, which is located near his girlfriend's residence. The defendant then walked back and got inside his pickup truck at about 3:30 a.m. However, on the way back to his truck, a short distance before reaching it, he encountered a fellow who asked him if he had a cigarette. He replied in the negative by stating that he was out of cigarettes. He denied that the individual asked him if The Corner was open. At the time, he was wearing a gray shirt (state exhibit S-1), black pants and brown shoes. More particularly, the defendant specifically denied that he had that shirt under his arm. After the encounter referred to above, the defendant took Jefferson Marks home. The defendant then drove home and went to bed.
The defendant admitted to three conversations with the victim on the date in question, all of which occurred inside the Funky London. However, he denied that he had talked to the victim near the Covington Curriculum Center and that he had stood under an oak tree with her. The defendant identified state exhibit S-2 (the pocket knife) as his knife. However, he stated that he did not have the knife with him, and he denied that he had stabbed anyone with it. The defendant testified that there was a pack of cigarettes inside his truck. However, he maintained that he had purchased it from a store the following morning on his way to work. Additionally, the defendant denied he had washed the clothes he had worn on December 8-9. Instead, he stated he had thrown them across his bed when he got home after taking Marks home.

RIGHT OF CONFRONTATION AND CROSS-EXAMINATION

(Assignment of Error Number 2)
The defendant contends that the trial court committed reversible error by improperly restricting defense counsel's cross-examination of Charles Strickland concerning pending criminal charges against him. The defendant asserts the testimony counsel sought to elicit was not general bad character evidence but rather evidence to show that the witness was corrupted or biased as contemplated by La. R.S. 15:492.
*1245 The state's case was based on circumstantial evidence. Charles Strickland was a key witness for the state. His testimony was crucial to the inferences upon which the state relied to prove the identity of the perpetrator of the offense. On direct examination, in an apparent attempt to blunt the defense's cross-examination of Strickland, the state elicited his admission to a felony conviction. On cross-examination, defense counsel addressed that conviction in more detail. Thereafter, defense counsel sought to question Strickland as to whether or not there were "open charges" of narcotic violations against him and then as to whether or not two criminal cases (bearing docket numbers 138,015 and 138,016) were "open." In each instance, the state objected to the questioning, and the trial court sustained the state's objections. At that juncture, the jury was retired from the courtroom, and the following exchange occurred:
THE COURT: Mr. Simmons, this Court has in-instructed you. I sustained the objection of the State to you referring to any open cases. The only thing you can ask this witness is whether or not he has been convicted, and he has testified he has been convicted, and if you refer to any of these open cases, I am going to find you in contempt. If you go any further, I am going to find you in contempt of this Court and deal with it accordingly.
MR. SIMMONS: May I ask this question? May I ask Mr. Strickland if the State has made any deals with him in relation to the open cases that he has, and he has open cases. It goes to credibility. That's the only question I'm bringing out now is whether this witness is credible, and it does go to credibility. And that's the foundation for my asking the questions. I'm remiss for not asking that question first, but that was the proper question
THE COURT: That's right. That's not the way you approached it at all.
MR. SIMMONS: I'm offeringI need to ask that question, whether any deal has been made to this man.
THE COURT: You are not going to discuss the open cases. You can ask him if he has made any deals with the District Attorney's Office. I will allow that question. Beyond that, you cannot ask him anything else.
MR. SIMMONS: In relation to the open cases. It goes to credibility.
MR. FITZSIMMONS: May I be heard, Your Honor?
THE COURT: Yes, sir.
MR. FITZSIMMONS: Your Honor, with respect to these, as the Court has well pointed out to Mr. Simmons at the bench, it seems as though he can't get into arrests. Talking about open cases is nothing less and more than a charge like an arrest.
THE COURT: That's my ruling, Mr. Fitzsimmons. The only thing I will allow you to ask, Mr. Simmons, is whether or not he has made any deals with the State in regards to his testimony. I will allow that. If you refer to these open cases any more, I'm going to find you in contempt, because I'm instructing you not to discuss these cases any more in front of this jury, and that's why I retired the jury. And if you mention it again, I'm going to hold you in contempt.
MR. SIMMONS: Can I ask him about the open cases in connection with any deals?
THE COURT: No, sir. No, sir. You can ask him if he made a deal, and that's all.
Before the jury was returned to the courtroom, the trial court permitted defense counsel to make an offering of proof. During that offering, defense counsel questioned Strickland as to whether or not he had made any deal with the state in reference to the "open" (pending) criminal charges bearing docket numbers 138,015 and 138,016 and in regard to any recent arrests of Strickland. Then, after the jury was returned to the courtroom (in accordance with the trial court's ruling), defense counsel asked Strickland if the state had made any deals with him in regard to his trial testimony, and the witness answered *1246 that he had not made any deals whatsoever.
It is well settled that the "possibility that the prosecution may have leverage over a witness due to that witness' pending criminal charges is recognized as a valid area of cross-examination." State v. Rankin, 465 So.2d 679, 681 (La.1985). The instant case is similar to State v. Brady, 381 So.2d 819, 822 (La.1980), wherein the court observed as follows:
Defendant's attempted cross-examination about the arrest was not for the purpose of impeaching the witness' general credibilitythe arrest was not presented as proof that the witness is not credible because he has an arrest record. If that had been the case the trial court's ruling would have been correct. Rather, the focus of defendant's questioning was to establish that the district attorney's office had leverage over Mr. Brown as a result of the pending charge (or at least that Mr. Brown might have assumed so), a reason why Mr. Brown's credibility was or might be suspect in this particular case. R.S. 15:492 permits a witness to be questioned as to "any particular fact showing or tending to show" bias or interest in the case on trial and this Court has held on numerous occasions that a witness' hope or knowledge that he will receive leniency from the state is highly relevant to establish bias or interest.
. . . .
The trial court's ruling prevented the defendant from directly challenging the disinterestedness of the prosecution's only witness and prevented the jury from considering relevant information which could have diminished or negated the credibility of the state's only witness. We conclude that the limitation of defendant's cross-examination was prejudicial to the substantial rights of the accused, both his statutory right to impeach a witness' credibility by showing bias or interest and his constitutional right to cross-examine a witness against him. R.S. 15:492, United States Constitution, Amendment VI, Louisiana Constitution, Article I, Section 16. C.Cr.P. art. 921. [Footnote omitted.]
Although the trial court judge allowed counsel for the defendant to cross-examine Strickland about any "deals" he had with the state, counsel for the defendant was not allowed to cross-examine Strickland about pending criminal charges. Failure to allow cross-examination about pending criminal charges to show bias or interest is reversible error. State v. Harrison, 484 So.2d 882 (La.App. 1st Cir.), writ denied, 488 So.2d 688 (La.1986); State v. Jenkins, 476 So.2d 475 (La.App. 1st Cir. 1985).
This assignment of error has merit.[2]

DECREE
For the foregoing reasons, the conviction and sentence are reversed. This case is remanded to the district court for further proceedings.
REVERSED AND REMANDED.
Cartor, J., dissents and would affirm the conviction and sentence.
NOTES
[1] Robert Brown testified that the bar was previously known as the Funky London. The record reveals that that name was the name primarily used in testimony adduced at the trial.
[2] Because of our ruling on assignment of error number 2, it is unnecessary for us to address assignments of error numbers 1 and 3.