647 So.2d 1321 (1994)
STATE of Louisiana
v.
Sydney SMITH.
No. 94-KA-0621.
Court of Appeal of Louisiana, Fourth Circuit.
December 15, 1994.
*1323 Harry F. Connick, Dist. Atty. of Orleans Parish, Jack Peebles, Asst. Dist. Atty. of Orleans Parish, New Orleans, for plaintiff.
Sherry Watters, Orleans Indigent Defender Program, New Orleans, for defendant.
Before BYRNES, WARD and JONES, JJ.
JONES, Judge.
On August 5, 1993, defendant Sydney Smith was indicted on one count of second degree murder and one count of second degree feticide. At his arraignment, the defendant pled not guilty to both counts. On August 26, 1993, defendant received a copy of the police report and withdrew his discovery motions. The defendant filed a motion to quash the indictment on October 5, 1993. On the same day, the trial court denied the motion and noted defendant's objection to the ruling. The defendant also filed a motion to change his plea from not guilty to not guilty by reason of insanity, however, there is no indication in the record that the trial court granted defendant's motion. After a jury trial, the defendant was found guilty of manslaughter on count one and guilty as charged of second degree feticide on count two. The trial court ordered a pre-sentence investigation, and subsequently sentenced defendant to thirty years at hard labor on the manslaughter conviction and to ten years at hard labor on the second degree feticide conviction. The sentences are to run concurrently. The trial court denied the defendant's motion to reconsider sentence. He appeals.

STATEMENT OF THE FACTS
On the evening of June 17, 1993, the victim, Roselind Collins, arrived home after work to find her two nieces at her apartment with the defendant. Ms. Collins walked her two nieces to her sister, Wanda Trepagnier's house, which was approximately one and one-half blocks away. At that time, Ms. Collins visited with her sister for only a few minutes. As she was on her way home, Ms. Collins was met by the defendant. They returned to their apartment together. The defendant and Ms. Collins had been living together for three to four months.
At approximately 8:30 a.m. on June 18, 1993, Ms. Trepagnier and her boyfriend, Kenneth Bodden, were awakened by the defendant knocking at their front door. The defendant asked Mr. Bodden and Ms. Trepagnier to come to the apartment because he could not wake Ms. Collins. He told Mr. Bodden and Ms. Trepagnier that he and Ms. Collins had an argument the night before and that he strangled Ms. Collins. Before going over to the apartment, Ms. Trepagnier called 911.
When they arrived at the apartment, Ms. Trepagnier found Ms. Collins lying on her *1324 back on the bedroom floor between the bed and the wall. Ms. Trepagnier noticed that the victim did not appear to be breathing and she could not feel a pulse. She told the defendant that Roselind was dead. Soon thereafter, two emergency medical technicians arrived. EMT Cornell Wolfe testified at trial that when they arrived, the defendant showed them into the bedroom. The victim was lying between the bed and the wall. She was on her back with her legs crossed on the floor. When Mr. Wolfe touched the victim, she was cold. Rigor mortis had set in. Mr. Wolfe then radioed for the police. Mr. Wolfe observed bruises on the victim's arms and two scratch marks on the left side of her neck. The defendant asked Mr. Wolfe if the victim was dead. Mr. Wolfe informed the defendant that the victim was dead. The defendant then told Mr. Wolfe that he and the victim had an argument and he choked her until she fainted. Mr. Wolfe stated that the defendant was calm and cooperative.
Officer Luther Lumpkin of the New Orleans Police Department was the first police officer on the scene. He testified that the bedroom had the appearance that a slight struggle had taken place. Some things had been knocked around and the mattress was pushed off the bed. The officer testified that the defendant had scratches on his face but he saw no blood. The officer also stated that the defendant appeared to have been drinking. While the officer was patting the defendant down for weapons, the defendant informed the officer that he strangled the victim. After the patdown, the officer informed the defendant of his constitutional rights and arrested the defendant for murder.
Dr. Richard Tracey, an expert in forensic pathology, performed the autopsy on the victim. Dr. Tracey observed a number of very minor scratch marks around the victim's neck and on her left hand. The scratches occurred at about the time of death or possibly even after death. Dr. Tracey opined that the scratches could have been caused by the victim trying to pry the defendant's hands from her neck. Internally, the victim had signs of manual strangulation. The victim suffered a fracture of the hyoid bone, which is a little bone at the base of the tongue which can only be broken during a manual strangulation. According to Dr. Tracey, a severe shaking could not break the hyoid bone. The doctor also noted that the victim was four months pregnant at the time of death. Dr. Tracey testified that the fetus was alive at the time of the victim's death and appeared to be progressing normally. The fetus died because the victim died.
Ms. Trepagnier testified that Ms. Collins told her of the pregnancy about three weeks before Ms. Collins' death. The defendant was the father of the child. Ms. Collins was very happy about the pregnancy and involved in preparations for the child. She was buying clothes and planning to move into another apartment. Ms. Collins and the defendant were talking about getting married. According to Ms. Trepagnier, the defendant and the victim never had any previous fights. When Ms. Trepagnier entered her sister's bedroom the morning of June 18th, she noticed the room was in disarray. The mattress was off the bed. The defendant told her and Kenneth Bodden that the victim had asked him to leave. The defendant said that during the argument the victim approached him with a knife. The defendant showed Ms. Trepagnier the knife which was in the victim's right pocket. Ms. Trepagnier told the defendant to put the knife back in the pocket. Ms. Trepagnier noted there was no blood on the knife. In addition, Ms. Trepagnier indicated that the victim was left handed.
Detective Bradley Rhodes of the Homicide Division of the New Orleans Police Department supervised the investigation into the victim's murder. When he arrived on the scene, Officer Lumpkin advised him that the defendant had been arrested and advised of his rights. Detective Rhodes noticed that the bedroom appeared to be in disarray. He observed scratches on the victim's neck. Detective Rhodes transported the defendant to the Homicide Office where the defendant gave a statement. Prior to giving the statement, the defendant was again advised of his rights. Detective Rhodes noted that the defendant *1325 had no obvious injuries, although the defendant contended that the victim had cut him with a knife. Detective Rhodes took photographs of these alleged injuries which were small scratches and were not bleeding. There were no stab or defensive type wounds.
The defendant told Detective Rhodes that he did not mean to kill the victim. He stated that he and the victim were involved in a domestic dispute which resulted in harsh words and foul language. The victim was upset because the defendant had been drinking. After trying to throw the defendant's clothes out of the apartment, the victim went after him with a knife. The defendant left the apartment and went to a convenience store at the corner of Felicity and Magazine Streets. He called the police from a pay telephone at that intersection. The defendant told the police that he was having a dispute with his wife and sought their assistance. The defendant waited two and one-half hours for the police. In the meantime, the defendant spoke with a friend, Lincoln Arceneaux. The defendant told Arceneaux about the argument he had with Ms. Collins. Arceneaux told him to stay away from the apartment.
Later that evening, the defendant returned to the apartment. Ms. Collins told him he could not sleep there and jerked him out of the bed. She then pulled the mattress off the bed. The victim also started throwing some of the defendant's clothes into the living room. She returned to the bedroom with the knife and began slashing at the defendant. Blocking the knife, the defendant grabbed the victim's neck with both hands. He shook her until she fainted. The defendant then laid down and went to sleep. The next morning he woke up and found the victim asleep. He attempted to check the victim's pulse. When he could not get a pulse, he went to Ms. Trepagnier's house for help. The defendant stated that he and the victim never had any previous fights. He indicated that the victim cut him on the arm, face and head.
At trial, the defendant testified on his own behalf. While admitting that he shook the victim in self-defense, he denied telling Ms. Trepagnier and Mr. Bodden that he strangled the victim. The defendant admitted to having a previous conviction for illegal discharge of a firearm.

DISCUSSION AND LAW

Errors Patent
The defendant assigns as error the unconstitutionality of the statute defining the crime of second degree feticide. This alleged error patent will be discussed below. A review of the record for any other errors patent reveals none.

Assignment of Error No. 1
In his first assignment of error, the defendant contends that the trial court erred in denying his motion to quash the indictment on the basis of double jeopardy.
Both the Louisiana and United States Constitutions prohibit placing a person twice in jeopardy of life or limb for the same offense. United States Constitution, Amendment 5; Louisiana Constitution of 1974, Art. 1, § 15. Code of Criminal Procedure article 596 provides that
[d]ouble jeopardy exists in a second trial only when the charge in that trial is:
(1) Identical with or a different grade of the same offense for which the defendant was in jeopardy in the first trial, whether or not a responsive verdict could have been rendered in the first trial as to the charge in the second trial; or
(2) Based on part of a continuous offense for which offense the defendant was in jeopardy in the first trial.
The defendant argues that his prosecution for second degree murder and second degree feticide violated his rights against double jeopardy as defined in Grady v. Corbin, 495 U.S. 508, 110 S.Ct. 2084, 109 L.Ed. 2d 548 (1990). The United States Supreme Court in Grady recognized the "same conduct" test of double jeopardy. However, the Court overruled Grady in United States v. *1326 Dixon, ___ U.S. ___, 113 S.Ct. 2849, 125 L.Ed.2d 556 (1993). In Dixon, the Court reaffirmed the test enunciated in Blockburger v. United States, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932) for determining whether double jeopardy barred the prosecution of multiple charges.
In Blockburger, id., the United States Supreme Court held that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one is whether each provision requires proof of an additional fact which the other does not.
The "same evidence" test is used in Louisiana. State v. Steele, 387 So.2d 1175 (1980); State v. Bonfanti, 262 La. 153, 262 So.2d 504 (1972). If the evidence required to support a finding of guilt of one crime would also have supported conviction of the other, the two are the same under a plea of double jeopardy, and a defendant can be placed in jeopardy for only one of the two crimes. The test depends on the evidence necessary for conviction, not all the evidence introduced at trial. State v. Steele, supra; State v. Doughty, 379 So.2d 1088 (La.1980).
In the present case, the defendant was charged with one count of second degree murder in violation of La.R.S. 14:30.1, and one count of second degree feticide in violation of La.R.S. 14:32.7. The jury convicted the defendant of manslaughter on count one and second degree feticide on count two. Second degree murder is defined as the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm. La.R.S. 14:30.1(A)(1). Manslaughter is a
homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed.
La.R.S. 14:31(A).
La.R.S. 14:32.7(A)(2)(a) defines second degree feticide as a "feticide committed without any intent to cause death or great bodily harm when the offender is engaged in the perpetration or attempted perpetration of any felony not enumerated in Article 32.6 (first degree feticide), or of any intentional misdemeanor directly affecting the person." Second degree murder and manslaughter are not among the felonies enumerated in La. R.S. 14:32.6.
The plaintiff likens the second degree feticide statute to the portions of La.R.S. 14:30, 30.1 and 31 which provide for murders which occur during the perpetration or attempted perpetration of a felony. Under these provisions, one of the elements that the state must prove is that the murder was committed during the perpetration or attempted perpetration of certain felonies. The jurisprudence has established that a defendant cannot be charged with felony murder and the underlying felony. See State ex rel. Adams v. Butler, 558 So.2d 552 (La. 1990).
In the present case, the state argues that the death of Ms. Collins' unborn child occurred during the perpetration of the murder of Ms. Collins. Thus, in order to convict the defendant of second degree feticide, the state had to prove that the defendant murdered Roselind Collins. The same evidence used to convict the defendant of manslaughter was also used to convict the defendant of second degree feticide. Using the "same evidence" test, it is apparent that the defendant's convictions for manslaughter and second degree feticide violate his rights against double jeopardy.
In State v. Stevenson, 597 So.2d 74 (La. App.4th Cir.1992), writ denied, 600 So.2d 637 (La.1992), this court found that the defendant's convictions for attempted first degree murder and armed robbery violated the double *1327 jeopardy clauses of the Louisiana and United States Constitutions. The court noted that under State ex rel. Adams v. Butler, supra, the general rule when a double jeopardy violation is found is to vacate the conviction and sentence for the less severely punishable offense, affirm the conviction for the more severely punishable offense and remand the case for resentencing with the restriction that the new sentence imposed for the single remaining conviction cannot be more severe than the total of the original sentence imposed.
This assignment has merit, therefore, we find that the defendant's conviction and sentence for second degree feticide must be vacated, the defendant's conviction for manslaughter affirmed, and the matter remanded for resentencing on the manslaughter conviction, as the conviction for feticide violated the state constitutional ban as to double jeopardy.

Assignment of Error No. 2
In this assignment of error, the defendant contends that the state failed to produce sufficient evidence to prove beyond a reasonable doubt his conviction for second degree feticide. As the defendant's conviction on the second degree feticide must be vacated, we pretermit this issue as moot.

Assignment of Error No. 3
The defendant further argues that the trial court failed to consider the sentencing guidelines prior to sentencing the defendant and that the sentences imposed by the trial court are unconstitutionally excessive. As defendant's conviction and sentence for second degree feticide must be vacated and the matter remanded for resentencing on the manslaughter conviction, discussion of this assignment of error is pretermitted.

Assignment of Error No. 4
In this assignment, the defendant contends that the trial court erred in denying his motion for mistrial during opening statement when the prosecutor made a reference to a statement defendant had given to Detective Rhodes. The trial court sustained the defendant's objection to the state's remark but refused to grant a mistrial. Defense counsel objected when the state remarked
[y]ou'll hear from Detective Rhodes who will tell you that when he arrived, he took the defendant downtook a statement from the defendant wherein he admitted what he had done. But he did say in his defense that
Trial transcript, p. 8.
La.Code Crim.P. art. 767 provides that "[t]he state shall not, in the opening statement, advert in any way to a confession or inculpatory statement made by the defendant." The scope of counsel's opening statement is left to the sound discretion of the trial judge and in the absence of an abuse of discretion an appellate court should not reverse a lower court's ruling. State v. Denny, 352 So.2d 204 (La.1977). The purpose of the scheme of La.Code Crim.P. arts. 766-768 is to prevent surprise and allow adequate time for preparation of the defense, as well as to avoid certain problems that had been attendant to the mentioning of confessions or inculpatory statements in the state's opening statement. State v. Parker, 436 So.2d 495 (La.1983); State v. Dickerson, 538 So.2d 1063 (La.App.4th Cir.1989).
Further, mistrial is a drastic remedy which should be declared when unnecessary prejudice results to the defendant. State v. Smith, 430 So.2d 31 (La.1983). The trial court has discretion to determine whether a fair trial is impossible, or whether an admonition is adequate to assure a fair trial when the alleged misconduct does not fit into the provisions for mandatory mistrial, and the ruling will not be disturbed on review absent an abuse of discretion. State v. Narcisse, 426 So.2d 118 (La.1983), cert. denied, 464 U.S. 865, 104 S.Ct. 202, 78 L.Ed.2d 176 (1983).
In Dickerson, supra, this court found no error in the trial court's denial of defendant's motion for mistrial. The defendant sought a mistrial when the prosecutor made a remark in his opening statement that the defendant *1328 made a statement to the police officer. The appellate court found that the defendant suffered no prejudice from the remark as defendant knew, prior to trial, of the existence of the statement and the state's intention of using the statement at trial.
Likewise, in the present case, the defendant knew, prior to trial, of the existence of the statement and the state's intention of using the statement. Defendant had been provided with a copy of the police report which indicated that the defendant had made statements to various persons that he strangled the victim. Before trial, the state filed notices of intent to use statements made by the defendant to Detective Rhodes, EMT Cornell Wolfe, Wanda Trepagnier and Kenneth Bodden. Furthermore, the prosecutor's remark was terminated as soon as defense counsel objected. Thus, the prosecutor did not refer to any details of the statement. Therefore, this court cannot say that the trial court abused its great discretion in denying the defendant's motion for mistrial. Prosecutorial misconduct prejudices the trial process. However, as defendant knew of the existence of the statement and the state's intent of using the statement prior to trial, the defendant has not shown that he suffered any prejudice. This assignment is without merit.

Assignment of Error No. 5
The defendant further contends that the statute defining second degree feticide is unconstitutionally vague. Specifically, the defendant argues that the term "killing" is vague as used in the statute.
We pretermit a discussion of this issue, having vacated and set aside defendant's conviction under La.R.S. 14:327.

Assignment of Error No. 6
By this assignment, the defendant argues that the trial court erred in failing to instruct the jury on the alleged lesser included charge of third degree feticide. A review of the trial transcript reveals that defendant did not seek such an instruction or object to the exclusion of an instruction on third degree feticide. Accordingly, defendant is precluded from raising this issue on appeal. La.Code Crim.P. art. 841.

Assignment of Error No. 7
In this assignment, the defendant suggests that his trial counsel was ineffective. Defendant contends that trial counsel was ineffective in (1) the withdrawal of pre-trial motions; (2) failing to pursue supervisory writs from the pre-trial denials of his motions to quash and motion for an expert; (3) failing to give an opening statement; (4) failing to make a closing argument; and (5) failing to object to the trial court's failure to instruct and include the lesser included offense of third degree feticide.
Generally, the issue of ineffective assistance of counsel is addressed by an application for post conviction relief filed in the trial court where a full evidentiary hearing on the issue can be conducted. State v. Prudholm, 446 So.2d 729 (La.1984); State v. Johnson, 622 So.2d 845 (La.App.4th Cir. 1993). However, when the appeal record contains enough evidence upon which to base a ruling on the issue, the appellate court will make a determination in the interest of judicial economy. State v. Seiss, 428 So.2d 444 (La.1983); State v. Johnson, supra.
A defendant must show that counsel's performance was deficient and that this deficiency prejudiced him. Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). See also State v. Bell, 543 So.2d 965 (La.App.4th Cir.1989). "Such performance is ineffective when it can be shown that counsel made errors so serious that he was not functioning as the `counsel' guaranteed by the Sixth Amendment." Bell, id at 969. Counsel's deficient performance will have prejudiced the defendant if it can be shown that counsel's errors were so serious as to deprive the defendant of a fair trial, one whose result is reliable. Strickland; Bell; State v. Crowley, 475 So.2d 783 (La. App.4th Cir.1985). The defendant has the *1329 burden of showing "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, supra 466 U.S. at 694, 104 S.Ct. at 2068.
Defendant argues that trial counsel was ineffective in withdrawing pre-trial motions, failing to seek supervisory review of the denial of his pre-trial motions to quash and for an expert, and failing to give opening and closing arguments. Defense counsel is not obligated to make an opening statement. La.Code Crim.P. art. 765. In order to claim that the failure of trial counsel to make an opening statement resulted in ineffective assistance of counsel the defendant must make a showing of specific prejudice. State v. Cheatham, 519 So.2d 188 (La.App.4th Cir. 1987), writ denied, 523 So.2d 228 (La.1988). In addition, if an alleged error falls "within the ambit of trial strategy" it does not "establish ineffective assistance of counsel." State v. Bienemy, 483 So.2d 1105 (La. App.4th Cir.1986). Moreover, as "opinions may differ on the advisability of a tactic, hindsight is not the proper perspective for judging the competence of counsel's trial decisions. Neither may an attorney's level of representation be determined by whether a particular strategy is successful." State v. Brooks, 505 So.2d 714, 724 (La.1987), cert. denied, 484 U.S. 947, 108 S.Ct. 337, 98 L.Ed.2d 363 (1987).
In State v. Gales, 622 So.2d 808 (La. App.4th Cir.1993), this court found that trial counsel's decision to withdraw discovery motions upon receipt of the police report did not constitute ineffective assistance of counsel. The court noted that such a decision was part of the attorney's trial strategy.
In the case at bar, trial counsel's decision to withdraw his discovery motions upon receipt of the police report was likewise part of counsel's trial strategy. Similarly, counsel's decisions not to seek supervisory review of the denial of his motions, to give an opening statement and make a closing argument are all part of an attorney's trial strategy. This assignment of error is without merit.
Accordingly, the defendant's conviction and sentence for second degree feticide is vacated, his conviction for manslaughter affirmed, his sentence for the manslaughter conviction vacated and the matter remanded for resentencing.
CONVICTION FOR MANSLAUGHTER AFFIRMED; SENTENCE FOR MANSLAUGHTER VACATED; CONVICTION AND SENTENCE FOR SECOND DEGREE FETICIDE VACATED; REMANDED FOR RESENTENCING.