671 So.2d 493 (1995)
STATE of Louisiana
v.
Johnny POWELL.
No. 94 KA 1390.
Court of Appeal of Louisiana, First Circuit.
October 6, 1995.
Writ Denied February 9, 1996.
*495 Doug Moreau, District Attorney by Barry Fontenot, Baton Rouge, for Appellee State of Louisiana.
David Price, Office of Public Defender, Baton Rouge, for Defendant/Appellant Johnny Powell.
Before SHORTESS, PARRO and KUHN, JJ.
KUHN, Judge.
Defendant, Johnny Powell, was charged by grand jury indictment with one count of second degree murder, a violation of La.R.S. 14:30.1, and one count of second degree feticide, a violation of La.R.S. 14:32.7. He pled not guilty and, after trial by jury, was found guilty as charged on each count. Defendant was sentenced for his conviction of second degree murder to life in prison at hard labor without benefit of parole, probation, or suspension of sentence. In addition, defendant was sentenced to five years at hard labor, with credit for time served, for the second degree feticide conviction; the sentences to be served concurrently. Defendant appeals raising the following assignments of error:
1. The trial court erred in denying his motion to quash.
2. The trial court erred in denying production of the rap sheets of two state witnesses.
3. The trial court erred in denying the defendant's instruction on negligent homicide.
4. The trial court erred in refusing to give instruction on how to determine the reasonableness of the defendant's actions.
5. The evidence was insufficient to support the convictions.
6. The convictions of both counts unconstitutionally punishes the defendant twice for one act and violates double jeopardy principles.
Because defendant expressly abandoned assignments of error numbers one and three in his brief, we will not address them.

FACTS:
On May 9, 1993, outside Jodice's Club on Scenic Highway in East Baton Rouge Parish, defendant and another man had pulled guns on each other. They were separated by Trade Variste. Defendant proceeded to the rear of the club and returned to the front as a passenger in an automobile, firing a gun numerous times from over the top of the vehicle. One of the bullets struck the victim, Bridgett Stewart, who bled to death as a result of the gunshot wound. The victim was pregnant at the time and the gestational age of the fetus, which also died, was estimated to be two months old. Defendant subsequently was arrested for the shooting after being identified by witnesses.

ASSIGNMENT OF ERROR NUMBER TWO:
In his second assignment of error, defendant contends the trial court erred in denying the production of the rap sheets of two state witnesses. Maintaining he should have been allowed to have copies of the rap sheets of two "key" witnesses, defendant argues he was denied a fair trial because examination of witnesses was limited to questions about "deals" made with the state and because he was refused access to evidence of pending charges which could have been used to attack the witnesses' credibility.
At the beginning of trial, the trial court granted the state a hearing on a motion in limine to determine whether the defense *496 could be permitted to question two state witnesses, Tracie Variste and Paulette Dunn, regarding their arrests the night before. At the hearing, defendant stated the rap sheets were being sought solely for impeachment purposes. The court limited defense counsel's inquiries to questions about any deals or agreements the witnesses may have had with the state. The court noted in addition to a general discovery motion, a written motion requesting the rap sheets had not been filed, and denied defendant's request for the rap sheets. Defense counsel did not object to the trial court's ruling.
To preserve the right to appeal an erroneous trial court ruling, the objecting party must make a timely objection and state the specific ground of the objection. See La.C.Cr.P. art. 841. Because defendant failed to object to the trial court's denial of access to the witnesses' rap sheets during the hearing on the state's motion, defendant did not preserve this issue for review on appeal.
Moreover, we find the trial court's denial of defendant's request for witnesses' rap sheets to be harmless error. In its reasons for not requiring production of rap sheets, the court relied on State v. Hooks, 421 So.2d 880 (La.1982). In Hooks, the supreme court stated the defendant is "almost automatically" entitled to a witness' prior criminal records where the witness is a co-defendant or co-conspirator with the defendant on trial. However, the court stated that there was no reason to require the state to furnish the criminal records of "civilian" witnesses who were not connected with the perpetration of the crime. Hooks further explains the defense has no statutory right to request the witnesses' criminal records from the state "even for the impeachment of the witnesses' credibility" as it is "irrelevant" where all of the witnesses were only observers, not participants. State v. Hooks, 421 So.2d at 883.
Defendant argues State v. Brumfield, 546 So.2d 1241 (La.App. 1st Cir.1989), writ denied, 556 So.2d 54 (La.1990), recognizes the right to cross-examine a witness about pending criminal charges. Defendant argues he was refused access to evidence (rap sheets) which may have been used to attack the witnesses' credibility and that the trial court erred when it would not permit defendant to question state witnesses about charges pending against each of them.
In Brumfield, the defendant asserted the testimony he sought to elicit from a witness was not general bad character evidence but, rather, evidence to specifically show the witness was corrupted or biased. The Brumfield court found the failure to permit cross-examination of a state witness about pending criminal charges to allow defendant to show bias or interest was reversible error. However, in the instant case, the record shows defendant gave general impeachment as the purpose for questioning the witnesses about pending charges. Defendant also stated he wanted to determine if the state and the witnesses had any "deals" involving the exchange of testimony for reduced sentences on any charges pending against the witnesses. The trial court allowed the defendant to ask about any pending "deals" but it would not allow defendant to have the witnesses' rap sheets "absent a showing of a particular need... other than just general impeachment" or to question the witnesses about any pending charges "absent a showing of some special circumstances." The court indicated it would have allowed questioning about the witnesses' pending charges if defendant could give any specific reason for the questioning. Thus we find no merit in defendant's reliance on Brumfield.
Defendant cites State v. Laird, 551 So.2d 1310 (La.1989) as additional authority for his argument that he should have been given the rap sheets. In Laird, the supreme court stated:
The state should make available rap sheets on all state witnesses in its possession or available to it on its computer system.
In the case at hand, there was no indication whether the state was in possession of the witnesses' rap sheets. The only evidence of pending charges in the record were the arrests that occurred the night before the hearing. There is no suggestion of other pending charges and defendant does not assert there are any, but merely speculates there may have been other charges. It is *497 unlikely these arrests were recorded on rap sheets by the time of trial, having occurred the night before the hearing. It is also unlikely there was enough time for a "deal" to have been struck between the state and the witnesses because these arrests were so close in time to the defendant's trial. Accordingly, we find the application of Laird to the facts in this case does not support defendant's argument.
We note the state was not informed prior to the hearing on the motion in limine of defendant's intention to ask these witnesses about the arrests. Also, the state asked Tracie Variste about her previous convictions, and on cross-examination, defense counsel questioned both Variste and Dunn about deals or agreements each may have had with the state. Both denied having made any. Therefore, we find defendant was not prejudiced by the denial of copies of Variste's and Dunn's rap sheets and any error which may have resulted was harmless.

ASSIGNMENT OF ERROR NUMBER FOUR:
Defendant contends the trial court erred in refusing to give an instruction on how to determine the reasonableness of the defendant's actions. Specifically, defendant contends his youth was an important factor in determining the reasonableness of his actions and that he timely requested this particular factor be included in the trial court's jury instructions. Because his requested charge was an accurate statement of law not covered by other parts of the jury charge, defendant claims the trial court should have permitted its inclusion. Defendant's written request for instructions included this charge:
In determining whether Johnny Powell acted reasonably under the circumstances you must take into consideration all the circumstances surrounding the events, including his age.
The state and defendant have the right to submit special written charges for the jury. La.C.Cr.P. art. 807. It is the duty of the trial court to give a requested jury charge when it does not require qualification, limitation, or explanation and is not included in the general charges or in another special charge to be given, if it is wholly correct and pertinent to the case. State v. Ford, 608 So.2d 1058, 1061 (La.App. 1st Cir.1992). The record before us shows the trial court properly instructed the jury to consider the reasonableness of the defendant's actions and beliefs in light of the circumstances surrounding this case. Defendant's age is one of the circumstances the jury could have considered. We find defendant's requested special charge was sufficiently included in the general charge given by the trial court and defendant's age was one of the circumstances the jury could have considered. Moreover, we note if the trial court had given the requested jury charge specifically about the defendant's age, it would have improperly pinpointed this issue out of proportion with others in the case. State v. Ford, 608 So.2d at 1062. Thus, we find the trial court did not err in refusing to give defendant's requested jury charge.

ASSIGNMENT OF ERROR NUMBER FIVE:
In his fifth assignment of error, defendant contends there was insufficient evidence to support his convictions. Because we find merit in defendant's assignment of error number six, we limit discussion of this issue to defendant's conviction of second degree murder.
In order to challenge a conviction on the basis of insufficiency of the evidence, defendant should proceed by way of a motion for post-verdict judgment of acquittal. See La.C.Cr.P. art. 821. Nevertheless, in the interest of justice, we consider the claim of insufficiency of the evidence because it has been briefed pursuant to a formal assignment of error. See State v. Tate, 506 So.2d 546, 551 (La.App. 1st Cir.), writ denied, 511 So.2d 1152 (La.1987).
Although defendant admits he fired a gun and caused the victim's death, he contends he did not possess the necessary specific intent element of second degree murder because there is no evidence he was able to see anyone standing in front of the club when he shot the gun or that he aimed the gun at anyone.
*498 The standard of review for the sufficiency of evidence is whether, viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could conclude the state proved the essential elements of the crime beyond a reasonable doubt. See La.C.Cr.P. art. 821; State v. King, 563 So.2d 449, 456 (La.App. 1st Cir.), writ denied, 567 So.2d 610 (La.1990). The Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), standard of review incorporated in Article 821 is an objective standard for testing the overall evidence, both direct and circumstantial, for reasonable doubt. When analyzing circumstantial evidence, La.R.S. 15:438 provides the fact finder must be satisfied the overall evidence excludes every reasonable hypothesis of innocence. State v. McLean, 525 So.2d 1251, 1255 (La.App. 1st Cir.), writ denied 532 So.2d 130 (La.1988). The court will not assess the credibility of witnesses or reweigh the evidence to overturn a fact finder's determination of guilt. State v. Polkey, 529 So.2d 474, 476 (La.App. 1st Cir.1988), writ denied 536 So.2d 1233 (La.1989).
La.R.S. 14:30.1(A)(1) provides:
Second degree murder is the killing of a human being:
When the offender has a specific intent to kill or to inflict great bodily harm....
Specific intent is that state of mind which exists when the circumstances indicate the offender actively desired the proscribed criminal consequences to follow his act or failure to act. La.R.S. 14:10(1). Specific intent may be proved by direct evidence, such as statements by defendant, or by inference from circumstantial evidence, such as a defendant's actions or facts depicting the circumstances. State v. Johnson, 461 So.2d 1273, 1277 (La.App. 1st Cir.1984).
In the present case, Trade Variste testified that on the night of May 9, 1993, she was at a club known as Jodice's on Scenic Highway. She had gone there with some friends, including Paulette Dunn. She stated that at approximately 1:00 a.m, she, the victim, Dunn, and two girls named Gwenella and Earline went outside the club. Standing outside talking, they observed groups of males also standing outside. One of the males was defendant. Variste knew the defendant and also identified a man known as "Puppy," although she testified she did not know his real name. According to Variste's testimony, defendant and Puppy stared at each other, then bumped into one another. Puppy pulled out a gun, which Variste believed to be an automatic. In response, defendant pulled his gun. Variste stood between the men and told them to leave. Puppy went into the club while defendant, still outside, proceeded to the rear of the club.
Defendant subsequently returned to the front of the club as a passenger in a station wagon, pulled his gun out and started shooting. According to Variste's description, defendant was standing through the passenger side window and shooting over the top of the car. The car was not going very fast and defendant shot when the car was in front of the club. Variste explained during the shooting she was standing by the victim and Dunn was in the doorway of the club with Puppy. She stated defendant was wearing a red tank top. Defendant finished shooting and the car sped away. Variste testified when defendant was shooting, Puppy tried to move Dunn out of the way. She did not see whether Puppy shot at defendant but she said she did not see anyone shooting from the club toward defendant.
On cross-examination, Variste stated the shooting occurred immediately after defendant's confrontation with Puppy. She was not really sure where the bullets came from, and specifically did not know whether any of the bullets came from the direction of the club because she was trying to get out of the way. Although Variste acknowledged she had been drinking that night, she stated she was not drunk.
Paulette Dunn's testimony was in conformity with Variste's, although she also stated defendant was shooting straight and not into the air. Dunn testified that she was standing by Puppy and he did not shoot a gun but was trying to flee from the shooting.
Dunn positively identified defendant as the person she saw shooting a gun. She explained that he held the gun with two hands and shot into the crowd of people in front of *499 the club. Dunn corroborated Variste's description that defendant was wearing a red tank top.
Glendoria Derson testified that on the night of May 9, 1993, she was at the Club also. She tried to go outside at about 1:30 a.m. but could not because a man was blocking her path at the door. She heard the man shout, "I'm going to burn me a m* * * * * f* * * * * tonight." The man had a gun in his hand. She identified exhibit S-41 as being similar to the gun he had. She stated the man was wearing a red tank top with dark colored pants. After he shouted, the man then walked through the club and out the back door. As she was walking to her car, shooting began. On cross-examination, Derson stated she did not see anyone else standing in the doorway at the time she heard the man shout the aforementioned statement.
Officer Kenneth Holmes of the Baton Rouge City Police Department testified he secured the crime scene. He stated there was a street light at the location of the crime scene.
Officer Richard Cochran, also of the Baton Rouge City Police Department, testified he investigated this crime. He gathered .45 and.44 shell casings from the street and the gravel. He identified a photograph of a red shirt found at a home on Hollywood Street, which was later determined to be the house of defendant's mother. He testified exhibit S-41 was a .45 pistol.
Joseph Rawls, an investigator with the East Baton Rouge Parish District Attorney's Office, testified he unsuccessfully attempted to locate the individual named Puppy. Patrick Lane, accepted as an expert in the field of firearms identification, testified that exhibit S-41 was a .45 pistol. He also identified three casings and a bullet found at the crime scene as having been fired from that particular pistol.
Officer Ben Odom of the Baton Rouge City Police Department testified he also investigated the crime scene. He found three .45 shell casings in the "far lane" of Scenic Highway. He talked to a friend of the victim who gave him defendant's name as a suspect and took him to defendant's house. Officer Odom subsequently arrested defendant after the officer observed defendant leaving the house in a car with his mother and another male. The officer stopped the car and, after determining defendant's mother was the owner, obtained her consent to search. Officer Odom found a bag containing a .45 automatic handgun in the car. Defendant's mother also consented to a search of her home on Hollywood Street where a red tank top was found. Odom stated when defendant was stopped while in his mother's car, the car was proceeding in a direction opposite from the police station. On cross-examination, Odom explained the lighting on Scenic Highway was bright and there was dim lighting in front of the club. A witness told Odom that a number of shots were fired from the street and not from the club.
Dr. Alfredo Suarez, accepted as an expert in the field of pathology, testified the victim bled to death as a result of the gunshot wound she sustained to her abdomen.
Defendant testified in his own defense. He stated that on the night of May 9, 1993, he went to Jodice's Club. He stood outside the front of the club talking to Variste when a friend of his stepped on Puppy's feet. Puppy pulled out a gun so defendant pulled out his .45 pistol. Variste separated them and no gunshots were exchanged at this time. Defendant stated he did not know Puppy. Defendant, still outside, walked to the rear of the club and got into a car with someone named Winkie. They drove to the front of the club where he saw Puppy standing in the doorway shooting a gun in the direction of the car. The defendant admitted he hung out of the car's window as described by the witnesses. However, defendant stated that he did not see anyone in front of the club, only gunshots coming from the doorway of the club. He claimed two bullets hit the car in which he was riding. According to defendant's testimony, Puppy fired the first shot and he shot back. He described that he was shooting into the air and not at anyone in particular. He was "shooting just to get away," and because Puppy shot at him. According to defendant's testimony, he thought *500 shooting at Puppy might make Puppy stop shooting.
Defendant testified he knew the victim and did not have anything against her. He did not think he had shot anyone until his mother advised him that he had killed the victim and that he should turn himself in to the police. He and his mother were in route to his grandmother's house to call the police to tell them he was on his way to turn himself in when he was stopped by the police. Defendant denied wearing a red tank top to the club that night. He said he was not trying to shoot or kill anyone.
On cross-examination, defendant admitted going to the club and seeing Puppy, the victim, Dunn, and Variste at the club, and that the .45 automatic handgun he carried was the gun he used in the shooting. According to defendant, Puppy had a .25 automatic handgun and defendant pulled his gun only after Puppy put a gun to the head of defendant's friend. Defendant explained he got into the car after Variste separated him and Puppy and he was calm at that point. After they drove in front of the club, Puppy shot first. Defendant claimed Puppy shot his gun five or six times.
Defendant stated he held the gun in his right hand and was not looking into the crowd when he shot. Defendant said when Puppy started shooting he did not really think the shots were going to hit him. According to defendant, he shot in self-defense because Puppy shot first. Defendant testified he was not in fear of Puppy hurting him and admitted that he did not believe he was in danger of being killed. After the shooting, defendant sped away in the car with his friend. He conceded he did not call the police even though someone had been shooting at him.
Defendant acknowledged the first two statements he gave to the police about the incident were not true. He stated that when he rode in front of the club he did not see anyone except for Puppy standing at the door shooting. Defendant conceded the casings from his gun were found in the southbound lane of Scenic Highway. He admitted that if someone aiming a loaded gun pulled the trigger the person at whom it was aimed would get shot. Defendant said he did not point his gun at any people and did not think the bullets would hit anyone. He admitted the red shirt the police found at the house was his shirt.
A specific intent to kill or inflict great bodily harm can be inferred from a shooting which occurs at a fairly close range. See La.R.S. 14:30.1(A)(1); State v. Navarre, 498 So.2d 249, 252 (La.App. 1st Cir.1986); State v. Price, 498 So.2d 244, 247 (La.App. 1st Cir.1986), writ denied, 503 So.2d 474 (La.1987). The trier of fact may accept or reject, in whole or in part, the testimony of any witness. Moreover, when there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. State v. Johnson, 529 So.2d 466, 473 (La.App. 1st Cir.1988), writ denied, 536 So.2d 1233 (La.1989).
The evidence presented at trial indicates defendant shot his gun more than once from a slow moving car into a crowd of people. Defendant was not shooting into the air or into another direction in order to frighten the people. Although he claimed he did not see anyone in front of the club, there is sufficient evidence to support a finding that just prior to the shooting defendant was talking to people standing in front of the club. This finding is further supported by testimony that there was lighting in front of the club.
We find a specific intent to kill or inflict great bodily harm can be inferred from the circumstances of the shooting. After a careful review of the entire record, we conclude a rational trier of fact, viewing all of the evidence, both direct and circumstantial, as favorable to the prosecution as any rational fact finder can, could have determined beyond a reasonable doubt the defendant was guilty of second degree murder.

ASSIGNMENT OF ERROR NUMBER SIX:
Defendant's final contention is the convictions of second degree murder and second degree feticide unconstitutionally punish him *501 twice for one act. Because the state relied on the second degree murder charge as the underlying felony for the second degree feticide charge, defendant asserts the dual convictions violate statutory and constitutional bars against double jeopardy.
The grand jury indictment states with regard to count two that defendant "committed second degree feticide of the unborn child of Bridgett Stewart by killing the child while engaged in the perpetration of a felony or an intentional misdemeanor directly affecting the person." Although the indictment does not indicate the underlying charge, at a hearing on the defendant's motion to quash the indictment[1] the state asserted it would rely on the second degree murder of the mother as the underlying felony for the charge of second degree feticide.
Both the Louisiana and the United States constitutions prohibit placing a person twice in jeopardy of life or limb for the same offense. United States Constitution, Amendment 5; Louisiana Constitution of 1974, Art. I, Sec. 15. Double jeopardy provisions protect an accused not only from a second prosecution on the same offense, but also from multiple punishments for the same criminal conduct. Double jeopardy exists where a defendant is convicted of felony-murder and the underlying felony. State v. Brown, 567 So.2d 1152, 1154 (La.App. 3d Cir.1990).
In Blockburger v. United States, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), the United States Supreme Court held that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one is whether each provision requires proof of an additional fact which the other does not.
Louisiana uses both the "Blockburger" test and the "same evidence" test. See State v. Steele, 387 So.2d 1175, 1177 (La. 1980). The Louisiana Supreme Court explained the "same evidence" test in State v. Steele, 387 So.2d at 1177, as follows:
If the evidence required to support a finding of guilt of one crime would also have supported conviction of the other, the two are the same offense under a plea of double jeopardy, and a defendant can be placed in jeopardy for only one. The test depends on the evidence necessary for conviction, not all the evidence introduced at trial.
The "same evidence test" is somewhat broader in concept than Blockburger, the central idea being that one should not be punished (or put in jeopardy) twice for the same course of conduct. [Citations omitted.]
In the case now before us, defendant was charged with one count of second degree murder in violation of La.R.S. 14:30.1, and one count of second degree feticide in violation of La.R.S. 14:32.7. The jury found defendant guilty on both counts. La.R.S. 14:32.7(A)(2)(a) defines second degree feticide as a feticide committed without intent to cause death or bodily harm "[w]hen the offender is engaged in the perpetration or attempted perpetration of any felony not enumerated in Article 32.6 (first degree feticide), or of any intentional misdemeanor directly affecting the person[.]" Second degree murder is not one of the felonies enumerated in La.R.S. 14:32.6.
Defendant likens La.R.S. 14:32.7 to the portions of La.R.S. 14:30, 30.1, and 31, which provide for homicides occurring during the perpetration or attempted perpetration of a felony. Under these provisions, one of the elements the state must prove is the homicide was committed during the perpetration or attempted perpetration of certain felonies. The jurisprudence has established a defendant cannot be charged with the felony murder and the underlying felony. State v. *502 Smith, 94-0621, p. 8 (La.App. 4th Cir. 12/15/94), 647 So.2d 1321, 1326.
In the instant case, the death of Stewart's unborn child occurred due to the death of Stewart. Because the state was using the murder as the underlying felony for feticide to prove defendant was guilty of feticide, the state also had to prove that defendant was guilty of second degree murder. The same evidence used to convict defendant of second degree murder was also used to convict defendant of second degree feticide.
Courts are often called upon to adhere to constitutional principles which must be honored to clearly and impartially apply the law. This is true regardless of how offensive a defendant's conduct may appear when viewed from a moral perspective. A defendant is entitled to all the protections of rights created by both the United States and Louisiana constitutions. In applying the "same evidence" test, we find defendant's convictions of second degree murder and second degree feticide violate his right against double jeopardy. See State v. Smith, 647 So.2d at 1326.
In State ex rel. Adams v. Butler, 558 So.2d 552, 553-554 (La.1990), the Louisiana Supreme Court noted the general rule when a double jeopardy violation is found is to vacate the conviction and sentence for the less severely punishable offense, affirm the conviction for the more severely punishable offense, and remand the case for resentencing with the restriction that the new sentence imposed for the single remaining conviction cannot be more severe than the total of the original sentence imposed. However, we find this approach to be unnecessary here because for his conviction of second degree murder, the defendant received the mandatory sentence of life in prison. Therefore, we find no need to remand for resentencing of a mandatory sentence.

PATENT ERROR:
Under the authority of Louisiana Code of Criminal Procedure article 920(2), this court routinely reviews appellate records for patent error. After reviewing the record, we have discovered a patent sentencing error; the trial court failed to give the defendant credit for time served for his conviction of second degree murder. See La.C.Cr.P. art. 880. Accordingly, we amend the sentence to reflect that the defendant is to be given credit for time served prior to the execution of the sentence. See State v. Greer, 572 So.2d 1166, 1172 (La.App. 1st Cir.1990). Resentencing is not required; however, we remand this case and order the trial court to amend the minute entry from the sentencing to reflect that the defendant is to be given credit for time served for his conviction of second degree murder.

CONCLUSION:
For the reasons stated herein, we vacate the defendant's conviction and sentence for second degree feticide because it violated the state constitutional ban against double jeopardy. We affirm the defendant's conviction and sentence for second degree murder.
CONVICTION AND SENTENCE OF SECOND DEGREE MURDER AFFIRMED; CONVICTION AND SENTENCE OF SECOND DEGREE FETICIDE VACATED; REMANDED WITH ORDER.
NOTES
[1] A hearing was held on February 14, 1994 on defendant's motion to quash the indictment for second degree feticide. The basis of defendant's motion was that the statute is unconstitutionally vague and overbroad. The trial court denied the motion. According to the record, the defendant's motion to quash the indictment was not based on double jeopardy. However, because La.C.Cr.P. art. 594 states that double jeopardy can be raised at anytime, we will consider the merits of the defendant's assignment. See, State v. Picchini, 463 So.2d 714, 717 n. 1 (La.App. 4th Cir.), writ denied, 468 So.2d 1202 (La. 1985).