828 So.2d 180 (2002)
STATE of Louisiana, Appellee
v.
Roy Anthony WILLIAMS, Appellant.
No. 35,911-KA.
Court of Appeal of Louisiana, Second Circuit.
September 18, 2002.
*182 Louisiana Appellate Project by Paula C. Marx, Lafayette, Amy C. Ellender, for Appellant.
Richard Ieyoub, Attorney General, Robert W. Levy, District Attorney, Stephen K. Hearn, Jr., Clifford Royce Strider, III, Assistant District Attorneys, for Appellee.
Before BROWN, WILLIAMS and DREW, JJ.
DREW, J.
Roy Anthony Williams was tried by jury and convicted of second degree murder. La. R.S. 14:30.1. He was sentenced to life imprisonment without benefit of probation, parole, or suspension of sentence. He now appeals. We affirm.

TESTIMONY
Leonard E. Chargois testified that he met Alvin Gunn, Jr. in 1994, and that they had subsequently become as close as brothers. Chargois further testified that:
 he knew the defendant, who was Gunn's acquaintance;
 on the night of June 30, 1998, Chargois, Gunn, Joel Honeycutt, Joseph Hicks and the defendant were at Chargois' apartment in South Ruston in the early evening;
 The men were listening to music and drinking;
 he, as well as Williams and Gunn drank a few beers;
 Chargois drank a shot of gin;
 later, Charles Thomas arrived but did not drink;
 the group was first inside the apartment and then moved outside;
 about 10:00 p.m., the defendant and Gunn got into an argument about a bicycle;
 Gunn wanted the defendant's bicycle so as to visit a woman;
 the argument subsided and the group began to walk down the street;
 Chargois then let Thomas borrow his bicycle to go to the County Market and the others continued walking;
 near a bridge, the defendant and Gunn got into another argument about the defendant's bicycle;

*183  Gunn told Chargois, "Hold my hammer `cause I don't want to go to jail for hitting nobody in the head;"
 Gunn removed a hammer from his pocket and gave it to Chargois;
 although the argument escalated, the defendant and Gunn at this time did not physically threaten each other;
 Chargois intervened and told the two to go their separate ways;
 the defendant rode away on his bicycle and disappeared from sight;
 Gunn, Chargois, Hicks, and Honeycutt stayed at the bridge approximately 15 to 20 minutes before heading back toward Chargois' apartment;
 Chargois gave the hammer back to Gunn after the defendant left them at the bridge and Gunn put the hammer back in his pocket;
 Gunn settled down after the argument and was calm;
 Chargois and Gunn walked together, with Hicks and Honeycutt following;
 the defendant came from behind and rode up ahead of them, leaning over into a ditch and pulling up something long;
 Williams put the item on his handlebars and rode back down the hill toward Chargois and Gunn, who were standing by the bridge near a tree;
 Gunn put his hands up and started to plead for his life when the defendant pulled the trigger and fired one shot from a shotgun;
 the defendant was 15 to 20 feet away when he fired the shotgun at Gunn;
 Hicks and Honeycutt were on the far side of the bridge when this occurred;
 Gunn did not have anything in his hands; he had the hammer in his pocket;
 Williams fired two shots in the air, then rode away on his bicycle;
 Gunn was not breathing, when checked by Chargois;
 Gunn had his shirt on, but all he saw was blood;
 Chargois went to his mother-in-law's house and called 911;
 although Hicks and Honeycutt were witnesses, Chargois did not know where they went at the time he was dialing 911;
 after viewing a photograph of the victim, Chargois acknowledged that Gunn had his shirt in his hand;
 he did not know the present whereabouts of Honeycutt, but he knew Hicks was in jail in Texas;
 he knew that Honeycutt was interviewed by the police;
 the defendant had enough time to get a shotgun and place it in the ditch before the shooting; and
 he did not wrestle with the defendant over the gun, nor did he discharge the gun.
Roland Wilson, Sr. testified that:
 he awoke to the sound of a gunshot at 1:00 or 2:00 a.m. on July 1, 1998;
 he heard only one gunshot;
 he looked out of his house and saw a man riding quickly on a bicycle with a long gun; and
 he could not identify the man, but testified that the man had a white scarf around his head.
Javance Dunn testified that:
 he heard 3 gunshots on July 1, 1998;
 he knew it was a shotgun and stuck his head out of the door of his home;
 he saw the defendant, armed with a shotgun, slowly ride a bicycle up the road, coming from the direction of the shooting; and

*184  later he saw Honeycutt and another young man walk by his home.
Keon Mayfield testified that:
 he was talking to brothers Chris and John Hardyway out of the window of his home when he also heard gunshots; and
 afterwards, he saw the defendant riding a bicycle, armed with a shotgun.
Officer Tony Blake, Ruston Police Department, testified that:
 he responded to a 911 call on July 1, 1998, shortly before 2:00 a.m.;
 he walked to the house from which the 911 call originated;
 Chargois ran to Officer Jay Alexander, who arrived after Officer Blake;
 Chargois pointed to the northeast side of the bridge to the body of a deceased black male;
 Officer Blake called for investigators and secured the scene;
 Lt. Newsom, Lt. Doss, and Inspector Kavanaugh arrived;
 the bridge was well lighted except for the area where the body was found;
 he did not recall if Chargois appeared intoxicated or smelled of alcohol;
 he did not recall whether the victim smelled of alcohol;
Concerning this time frame, Chargois further testified that:
 he spoke with Officer Blake and told him that he was not at the scene but heard the gunshot;
 he did not tell the truth to Officer Blake because of fear that if the defendant was not apprehended, something might happen to him or his family;
 he spoke with Lt. Newsom and did answer his questions truthfully;
 he told Lt. Newsom that he was an eyewitness and that the defendant fired the gun that killed Gunn;
 after listening to the tape of the 911 call, which had been admitted into evidence, he admitted that he did not tell the dispatcher that he was an eyewitness, on account of his being shocked and upset;
 he could not explain himself clearly to the dispatcher;
 when he told the dispatcher that he did not know who did it, he (Chargois) meant that he did not know why the killer did it;
 he was not intoxicated that night; and
 he admitted having a criminal record.
Officer Jay Alexander, Ruston Police Department, testified that:
 he was also dispatched relative to the shooting;
 he arrived after Officer Blake;
 he saw a black male running excitedly;
 the man (Chargois) pointed to the side of the road to a body;
 the body of the black male was face up, with a hammer in one hand and a shirt in the other (later, he retracted the comment about the location of the hammer);
 he checked the body for vital signs, did not move anything, nor did he allow anyone else to disturb the evidence; and
 it was difficult to understand Chargois because of Chargois' excitement; however, there was no indication that Chargois was intoxicated.
Inspector James D. Kavanaugh, Ruston Police Department, testified that:
 he was called to South Ruston on July 1, 1998 to assist in the collection of evidence at the crime scene;
 Sgt. Stephen Forest Beard, Ruston Police Department, prepared the crime scene diagram;

*185  Gunn's body was face up with his feet pointed toward the street, holding his shirt in his right hand with nothing in his left hand;
 Gunn had a claw hammer (with a striking end and a nail puller end) completely enclosed in his right front pocket;
 the decedent's other pockets contained house keys, a flashlight, condoms, a bandana, and a pair of gloves;
 the decedent was wearing an LL Bean wristwatch; and
 one shotgun shell was found north of the body and two shotgun shells were found south of the body, near the bridge.
Lt. Tommy C. Doss, Ruston Police Department, testified that:
 he was also called in that morning to assist with the investigation;
 he shortly received information that the defendant was at a trailer home belonging to his mother, Helen Williams in Pecan Grove Trailer Park;
 the officers arrived at the trailer; and they knocked, but no one answered;
 some of the officers remained at the trailer while Lt. Doss contacted the defendant's brother at another trailer;
 the brother accompanied the officers to his sister's trailer in Lay's Trailer Park where their mother was staying;
 Mrs. Williams gave the officers permission to enter her trailer;
 when the officers returned to the original trailer, they did not locate the defendant, but did find a brown leather gun case, a box of twelve-gauge shots (matching the kind found at the scene), a black sling, and a binocular case.
Concerning events occurring approximately one week later, Officer Alexander testified that he:
 was asked to assist Lt. Newsom;
 he, Lt. Newsom, and Sgt. Groupe went to a trailer at Pecan Grove Trailer Park, where he found a black automatic Browning twelve gauge shotgun[1] in waist-high weeds under a tree about 30 to 40 yards behind the trailer; and
 the shotgun would normally hold three shells, unless it had been illegally altered.
Inspector Kavanaugh was recalled and testified that:
 the shotgun could not be fingerprinted because of the gun's matte finish and plastic components;
 it had rained for several days between the date of the crime and the date the gun was found, including the day the gun was found;
 there was no way to know if the shotgun had been outside for the entire seven or eight days since the shooting;
 that he would have fingerprinted the gun had it been possible; and
 he did not suspect that Chargois had anything to do with Gunn's death.
Deputy Sheriff Steve Rogers, Lincoln Parish Sheriff's Office, testified that he participated in the arrest of the defendant on July 9, 1998, and that he found the defendant lying between the mattress and box springs in a bedroom of the trailer.
Steven Timothy Hayne was accepted as an expert in forensic pathology and testified that:
 he performed an autopsy of Gunn;
 Gunn died of a shotgun wound to the mid left chest wall;
 multiple shot pellets went through Gunn's lungs, heart, diaphragm, liver, *186 and spleen leading to massive bleeding; and
 the spray of the shot indicated that the muzzle of the shotgun was approximately ten feet from Gunn when it was fired.
The defense rested without presenting any evidence. The jury found the defendant guilty of second degree murder. The defendant now appeals, arguing seven assignments of error.

DISCUSSION
The defendant argues that there was insufficient evidence that he possessed the specific intent to kill or inflict great bodily harm because the prosecution did not negate the possibility that the defendant was not the shooter or that the shooting was an accident. The defendant also argued that his conviction should be reduced to manslaughter.
The law on sufficiency of the evidence is clear.[2]
Second degree murder is the killing of a human being when the offender has the specific intent to kill or inflict great bodily harm or when the offender is engaged in the perpetration of an enumerated felony. La. R.S. 14:30.1. Manslaughter is a homicide that would be second degree murder but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. La. R.S. 14:31.
Specific intent is a state of mind and need not be proved as a fact; it may be inferred from the circumstances of the transaction and the actions of the defendant. State v. Graham, 420 So.2d 1126 (La.1982); State v. Fuller, 414 So.2d 306 (La.1982); State v. Doby, 540 So.2d 1008 (La.App. 2d Cir.1989), writ denied, 544 So.2d 398 (La.1989). Specific intent is that state of mind that exists when the circumstances indicate the offender actively desired the prescribed criminal consequences to follow his act. La. R.S. 14:10(1); State v. Lindsey, 543 So.2d 886 (La.1989), cert. denied, 494 U.S. 1074, 110 S.Ct. 1796, 108 L.Ed.2d 798 (1990); State v. McCray, 621 So.2d 94 (La.App. 2d Cir.1993).
*187 This court's authority to review questions of fact in a criminal case is limited to the sufficiency-of-the-evidence evaluation under Jackson, and does not extend to credibility determinations made by the trier of fact. State v. Williams, 448 So.2d 753 (La.App. 2d Cir.1984). A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part. Bosley, supra. In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. State v. Bellamy, 599 So.2d 326 (La.App. 2d Cir.1992), writ denied, 605 So.2d 1089 (La.1992).
Chargois testified that the defendant shot Gunn as Gunn pleaded for his life, and that the defendant fled the scene without stopping to render aid to Gunn. Several residents of the neighborhood saw the defendant riding away on his bicycle with a shotgun. The shotgun was found behind his mother's trailer. In addition, shotgun shells matching those found at the scene were recovered from his mother's trailer.
The defendant argues that the inconsistencies in Chargois' testimony make the jury's verdict unreasonable. Chargois told the dispatcher and the police officers who responded to the scene that he was not an eyewitness and merely heard the gunshot. In addition, the defendant notes Chargois' initial testimony that Gunn had his shirt on and Officer Alexander's initial testimony that Gunn had the hammer in his hand. However, Chargois and Officer Alexander testified that they were mistaken on these points.
When a witness is impeached, this simply means the jury, as the trier of fact, is presented with evidence which it could consider and weigh in determining the credibility, or believability, of a witness. Simply because the witness may have been impeached by prior inconsistent statements does not mean that the jury is prohibited from believing anything said by the witness. The inconsistencies in the witness's statements are one of any number of factors the jury weighs in determining whether or not to believe a witness's trial testimony. State v. Dunn, 30,346 (La.App.2d Cir.2/25/98), 708 So.2d 512; State v. Bender, 598 So.2d 629 (La.App. 3d Cir.1992), writ denied, 605 So.2d 1125 (La. 1992).
The jury was presented with the apparent contradictions in the testimony of Chargois and Officer Alexander, yet implicitly made a credibility determination in their favor. Such a determination addresses the believability or weight, not the sufficiency, of the evidence against the defendant. It is the function of the trier of fact to make such a determination. When the trier of fact makes a rational determination, it will not be disturbed on appeal. Accordingly, the testimony was sufficient for a rational jury to find that the defendant had the specific intent to kill when he shot Gunn.
The existence of "sudden passion" and "heat of blood" are not elements of the offense but, rather, are factors in the nature of mitigating circumstances which may reduce the grade of homicide. Provocation is a question of fact to be determined by the trier of fact. Thus, the issue remaining is whether or not a rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could have found that the mitigatory factors were not established by a preponderance of the evidence. State v. Lombard, 486 So.2d 106 (La.1986).
The defendant argues that the testimony about the victim's hammer establishes the mitigatory factors. Although Chargois *188 and Officer Alexander initially testified that Gunn had the hammer in his hand, they later testified that the hammer was in Gunn's pocket. In addition, Inspector Kavanaugh testified that the hammer was totally enclosed in Gunn's pocket. Thus, it was reasonable for the jury to conclude that Gunn did not physically threaten the defendant with the hammer. In addition, Chargois testified that at least 15 minutes passed between the time of the defendant's argument with Gunn and the killing. Even if the prior argument between Gunn and Williams was sufficient to provoke a reasonable person, the jury could have reasonably found Williams' blood had ample time to cool before he returned. See State v. Cheatham, 519 So.2d 188 (La.App. 4th Cir.1987), writ denied 523 So.2d 228 (La.1988); State v. Allen, 94-1941 (La. App. 1st Cir.11/9/95), 664 So.2d 1264, writ denied 95-2946 (La.3/15/96), 669 So.2d 433; State v. Clark, 93-2090 (La.App. 4th Cir.5/17/94), 637 So.2d 1140. Thus, a rational jury could have found that the mitigatory factors for reduction of this crime to manslaughter were not established.
The defendant next argues that Lt. Doss' testimony that the defendant's mother told him that the defendant lived in her trailer was inadmissible hearsay. Further, the defendant argues that the hearsay was prejudicial because it helped link the defendant to the shotgun shells found in the trailer.
Hearsay is a statement other than one made by the declarant and offered in evidence to prove the truth of the matter asserted. La. C.E. art. 801(C). When hearsay evidence is improperly admitted at trial, the appellate court must decide whether the evidence contributed to the verdict. If the inadmissible hearsay evidence is merely cumulative or corroborative of other testimony introduced at trial, its admission is considered harmless. State v. Coleman, 32,906 (La.App.2d Cir.4/5/00), 756 So.2d 1218, writ denied 787 So.2d 1010 (La.2001).
Lt. Doss testified, without objection, that the police received information that the defendant was in the trailer and had been staying with his mother. Without corroboration from Mrs. Williams, this testimony alone helped establish a connection between the defendant and the trailer where the shotgun shells were found. Thus, even if the trial court did err in admitting the statement, it was a harmless error.
The defendant, pro se, argues that the trial court was without jurisdiction because there is no evidence in the record that the indictment was endorsed "a true bill" and signed by the grand jury foreperson or that the indictment was returned in open court. The defendant further argues that his counsel was ineffective for failing to file a motion to quash the indictment.
La.C.Cr.P. art. 382(A) provides in part that a prosecution of an offense punishable by death or life imprisonment shall be instituted by grand jury indictment. Second degree murder is punishable by life imprisonment. La. R.S. 14:30.1(13). Therefore, the defendant's prosecution for second degree murder should have been instituted by a grand jury indictment. Furthermore, the indictment must be endorsed "a true bill," signed by the foreman, and returned into the district court in open court. La.C.Cr.P. art. 383.
Although the bill of indictment originally included in the record did not display the proper endorsement and signature, the record was supplemented with a copy of both the front and back side of the indictment. The back of the indictment is endorsed a true bill and signed by the grand jury foreperson. Further, the minutes of *189 the trial court and the transcript indicate that the indictment was indeed returned in open court.
The defendant's pro se brief contains several pages detailing inaccuracies in the appellate record. In addition, the defendant alleges that the record is incomplete and has been altered by the court reporter.
Article I, § 19 of the Louisiana Constitution guarantees defendants a right of appeal "based upon a complete record of all the evidence upon which the judgment is based." In felony cases, the clerk of court or court stenographer shall record all proceedings, including the examination of prospective jurors, the testimony of witnesses, statements, rulings, orders, and charges by the court, and objections, questions, statements and arguments of counsel. La. C.Cr.P. art. 843; State v. Ford, 338 So.2d 107 (La.1976); State v. Mamon, 26,337 (La.App.2d Cir.12/16/94), 648 So.2d 1347, writ denied, 95-0220 (La.6/2/95), 654 So.2d 1104. To effectuate the guarantee of an appeal in felony cases, a complete record is needed for proper support and review of assigned errors. Mamon, supra; State v. Richardson, 529 So.2d 1301, 1308 (La.App. 3d Cir.1988), writ denied, 538 So.2d 587 (La.1989). However, an omission from the record which is inconsequential and immaterial to a proper review on appeal does not require reversal of a conviction. State v. Frank, 99-0553 (La.1/17/01), 803 So.2d 1; State v. Johnson, 438 So.2d 1091, 1104 (La.1983); Mamon, supra.
The only colorably arguable errors which can be gleaned from this/these pro se assignment(s) would be these two:
 the use of racially biased challenges by the state, and
 allegations that the state improperly engaged in ex parte communications with prospective jurors.
The defendant's recitation of the events after his attorney made a Batson objection appears to be off-the-record discussions between the attorneys and the trial court while the prosecutor and clerk's office scrambled to find documentation relative to the challenges. On the record, the prosecutor indicated that 33% of the jurors were African-American and of seven peremptory challenges used, five were used against African-Americans. The trial court found that the defendant did not establish a prima facie Batson challenge.
No formula exists for determining whether the defense has established a prima facie case of purposeful racial discrimination. A trial judge may take into account not only whether a pattern of strikes against African-American venire persons has emerged during voir dire but also whether "the prosecutor's questions and statements during voir dire examination and in exercising his challenges may support or refute an inference of discriminatory purpose." State v. Myers, 99-1803, p. 5 (La.4/11/00), 761 So.2d 498, 502 (quoting Batson v. Kentucky, 476 U.S. 79, 97, 106 S.Ct. 1712, 1723, 90 L.Ed.2d 69 (1986)). Batson accords a trial court considerable flexibility and broad discretion in this regard because "trial judges, experienced in supervising voir dire, will be able to decide if circumstances concerning a prosecutor's use of peremptory challenges creates a prima facie case of discrimination against black jurors." Batson, supra, at 1723.
The defendant's version of the events not included in the record, even if accepted as true, does not appear to constitute reversible error because there is absolutely no indication that the trial court abused its discretion in overruling the objection. The missing portions of the record clearly appear to be inconsequential.
Secondly, the defendant claims pro se that the prosecutor's office must have had *190 contact with a prospective juror because the prosecutor knew that one of the jurors was illiterate. In addition, the defendant alleged that someone in the prosecutor's office knew another juror. However, both jurors named by the defendant did not ultimately form part of the jury, making this complaint seem somewhat frivolous.
Given the nature of the defendant's claims, they may be more properly suited to post-conviction relief proceedings where there is an opportunity for a full evidentiary hearing. La.C.Cr.P. art. 930. However, based on what is in this record, the defendant's allegations regarding inaccuracies and alterations in the appellate record do not remotely approach reversible error.
Lastly, the defendant argues that he was denied effective assistance of counsel because his attorney failed to object to the state's use of challenges to exclude members of his race from the jury.
The law on sufficiency of counsel is well settled.[3]
As discussed previously, the defendant's attorney did in fact make an objection challenging the prosecutor's selection of jurors. The defendant points out that his lawyer did not technically call it a Batson challenge; however, the prosecutor and the trial court responded on that basis. The objection was overruled by the trial court because the defendant failed to establish a prima facie case of discrimination. The attorney's lack of nomenclature jargon did not prejudice the defendant.

DECREE
The defendant's conviction and sentence are AFFIRMED.
NOTES
[1] At trial, the defendant stipulated that this shotgun was the weapon that killed Gunn.
[2] The standard of appellate review for a sufficiency of evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Bosley, 29,253 (La.App.2d Cir.4/2/97), 691 So.2d 347, writ denied, 97-1203 (La.10/17/97), 701 So.2d 1333.

The Jackson standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that defendant was guilty of every essential element of the crime. State v. Sutton, 436 So.2d 471 (La.1983); State v. Owens, 30,903 (La.App.2d Cir.9/25/98), 719 So.2d 610, writ denied, 98-2723 (La.2/5/99), 737 So.2d 747.
When circumstantial evidence forms the basis for the conviction, such evidence must exclude every reasonable hypothesis of innocence. La. R.S. 15:438. The court does not determine whether another possible hypothesis suggested by the defendant could afford an exculpatory explanation of the events; rather, when evaluating the evidence in the light most favorable to the prosecution, the court determines whether the possible alternative hypothesis is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt under Jackson v. Virginia, supra. State v. Davis, 92-1623 (La.5/23/94), 637 So.2d 1012, cert. denied, 513 U.S. 975, 115 S.Ct. 450, 130 L.Ed.2d 359 (1994); State v. Owens, supra.
[3] The right of a defendant in a criminal proceeding to the effective assistance of counsel is mandated by the Sixth Amendment to the U.S. Constitution. State v. Wry, 591 So.2d 774. (La.App. 2d Cir.1991). A claim of ineffectiveness of counsel is analyzed under the two-prong test development by the United States Supreme Court in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); State v. Grissom, 624 So.2d 476 (La. App. 2d Cir.1993). To establish that his attorneys were ineffective, that defendant must first show that his counsels' performances were deficient. This requires a showing that counsel made errors so serious that they did not function as the "counsel" guaranteed by the Sixth Amendment. Strickland, supra.

Second, the defendant must show that counsel's deficient performance prejudiced his defense. This element requires a showing that the errors were so serious as to deprive the defendant of a fair trial, in which the result is reliable. Strickland, supra; State v. Grissom, supra.