MOORE, J.
1 iDefendant, Joseph Blueford, was charged with two counts of attempted second degree murder, a violation of La. R.S. 14:27 and 14:30.1, and possession of a firearm by a convicted felon, a violation of La. R.S. 14:95.1. A jury acquitted Blueford of one count of attempted murder, but on the second count, it convicted him of the responsive verdict of aggravated battery; the jury also convicted Blueford of possession of a firearm by a convicted felon. Subsequently, the state filed a habitual offender bill, and the district court found that the defendant was a fourth-felony offender. It sentenced Blueford to serve a life sentence at hard labor for aggravated battery and a concurrent 65-year hard labor term, without parole, for possession of a firearm by a convicted felon. Blue-ford now appeals, urging six assignments of error. For the following reasons, we affirm Blueford’s convictions and sentences.
Facts
A shooting incident occurred after midnight on January 1, 2011, at the Townhouse Club in Bastrop, Louisiana. The club was busy with guests celebrating the new year. Ms. Shekeva King, Ms. Ro-shonda Vance and Roshonda’s sister, Jennifer, drove to the club to purchase some *56 alcohol. Roshonda went into the club; shortly thereafter, Shekeva went in to find her. When the two women returned outside to the parking lot, Shekeva saw the defendant walk to his truck and retrieve a gun. She saw the defendant give the gun to a young man named Marcus Peoples.[1] The defendant and another man, Mark Ramey, then began fistfighting in the parking lot.
|2The fight did not last long. When it ended, Shekeva saw the defendant retrieve the gun from Marcus and walk back to his truck. She and Roshonda were standing near the truck. She said the defendant got into the driver’s side of the truck and then begin firing the pistol out of the passenger window. Shekeva testified that she was certain that the defendant was alone in the vehicle.
Roshonda, who also knew the defendant, did not observe the fight, although she was standing next to Shekeva in the parking lot when the shooting started. She testified, “we was just sittin’ around talkin’ or whatever.” “The next I knowed, he [the defendant] was drivin’ and just out of the passenger’s side and just shootin’.” One of the bullets hit Roshonda in the leg. Another man standing in the parking lot, Maurice Pitts,[2] was shot in the hand.[3]
Both victims were transported to Morehouse General Hospital. Morehouse Parish Sheriffs Office (“MPSO”) Deputy Josh Hawthorne learned of the incident and drove to the club to investigate. Neither the defendant nor the victims were present, so the deputy went to the hospital to interview the victims. The deputy testified that the witnesses were all able to tell him the identity of the shooter. Both Roshonda and Shekeva identified the defendant.
The other participant in the fistfight with the defendant, Mark Ramey, testified that he and the defendant fought for two or three minutes in the | .¡parking lot before the shooting. He testified that he did not see the defendant shooting the pistol into the crowd, although he had previously given a statement to law enforcement asserting that he had seen the defendant firing the gun. At trial, he admitted that he had lied to police “because at that time I was upset and going along with what everybody else said.” Mr. Ramey testified about what he saw:
Q: What you’re telling us here today is that you didn’t see anything? Is that what you’re telling us?
A: No. I seen the truck, but I seen shots fired out of the truck, but I didn’t actually see who, you know what I’m sayin’, who was shootin’. That’s what I said.
Q: Who was in the truck?
A: I seen Mr. Blueford on the driver’s side of the truck.
Q: That looked like the truck pulling out.
A: Yes, sir.
Q: Where did the shots come from?
A: Out of the passenger’s side window.
Q: Did you see anybody else get in the truck?
A; I can — I didn’t see anybody get in the truck.
*57 Ramey admitted that he previously had given different testimony at a hearing in which he said that two people got in the vehicle. He now testified that he was not sure if the truck had a passenger, and he did not actually see a second person get in the truck. He had previously assumed such, perhaps prior to Blueford getting in the truck, but he did not actually see another person get in the truck. He was sure that the defendant was the driver of the truck.
14At about 2:00 a.m. on the night of the shooting, MPSO Corporal Jamie Marble was on patrol. Near the MPSO office, Marble stopped a white SUV matching the description of the defendant’s truck and driven by the defendant. The defendant gave Marble permission to search the SUV. Marble found a spent cartridge case on the driver’s side rear seat. At that point, Marble called for assistance.
One of the responding deputies was MPSO Investigator Mitchell Jeselink. Deputy Jeselink searched the vehicle and found multiple spent cartridge cases inside the truck, including two on the front passenger’s seat.
Subsequently, Jeselink interviewed Mark Ramey. Jeselink testified that Ramey told him that the shooter was Blue-ford. Jeselink also learned that, immediately after the shooting, the defendant had first driven to the Bastrop Police Department and then went to the MPSO where Marble stopped the defendant.
In addition to the above evidence, the jury heard Roshonda testify that after she spoke with police, she went to the district attorney’s office and filled out a “drop slip” asking that the state drop the charges against Blueford related to her (Roshonda’s) injuries. The drop slip said, “drop the charges, I don’t know who did it,” but she testified at trial that this statement was not true, and that she made the request because “I feel that he wasn’t tryin’ to shoot me.”
During its case in chief, the state also introduced documentary evidence (including court records and fingerprints) and expert testimony proving that the defendant was the same person who pled guilty in 2008 in Morehouse Parish to the felony offense of illegal use of weapons and that the lfisheriff had not issued him a firearm permit.
Once the state rested, the defendant recalled Shekeva King and Roshonda Vance to question them about their pretrial contact with the district attorney’s office. Roshonda had previously denied that she had discussed her testimony with the state. Shekeva likewise denied that she had ever met with the district attorney. However, at the preliminary examination, Roshonda said that she, her sister, and Shekeva had met with an assistant district attorney in June 2011, where they encountered Tiffany Minnieweather, another club patron. They felt threatened by Ms. Minnieweather. Shekeva testified that she recalled the meeting, but it was about the threat they had received. Ro-shonda maintained that she did not remember the meeting.
Ms. Tiffany Minnieweather, a relative of the defendant, testified that she was in the club the night of the shooting and walked out with the defendant. She said, “When we got to the door they was like waiting on him and they jumped on him right there.” She later said that she only saw the defendant fighting Ramey. Ms. Minnieweather said that she left the scene and did not see the ensuing events including the shooting.
The defendant chose to testify. He said that he arrived at the club at about 12:30 a.m. Inside, he met an old friend, Bobby Mays, whom he had not seen since fifth grade. The defendant said that he got a *58 text message from “one of my partners” informing him that many people were standing around his truck in the parking lot. He went outside, accompanied by Bobby Mays, where he was confronted by Mr. Ramey. The defendant said that he and Ramey fought, paused, and then fought some more. As the fight progressed, | (¡the defendant and Bobby Mays headed toward the defendant’s SUV. The defendant explained that he got into the driver’s side of the SUV and Mays got into the front passenger seat, and in the meantime, a group of people approached the passenger side window of the SUV:
So, they all cornin’ to ... the passenger’s side window attackin’ him. And when they attackin’ him, they all in the window attackin’ him. They in my window attackin’ him. So as they attackin’ him, he backed up on me, he leanin’ on me. You know what I’m sayin’. He all up on me. So, I don’t know what happened. Before I knew it, shots fired out of my truck. Out of my truck. So when the shots were fired out of my truck, I pull off. So when I pull off, I come to the end of the parking lot of the Townhouse. So when I made it to the end of the parking lot and I stopped, Bobby Mays jumped out of my truck. So, when Bobby Mays jumped out of my truck, I immediately pull off. And when I pulled off, I immediately came to the city jail.
He said that he then went to the MPSO to report the incident, where he waited to speak to someone. He said that he left when no one came to speak to him, and, as he left, he was stopped by the deputy. On cross-examination, the defendant admitted that he had been convicted of several felony offenses including the offense underlying the possession of a firearm by a convicted felon charge.
On rebuttal, the state recalled Investigator Jeselink, who testified that Ms. Minnieweather came to see him on January 5th asking to speak with the defendant. The investigator said that Ms. Minnieweather refused to give a recorded statement, but drew a diagram and told him that she had seen the defendant firing shots from the vehicle. Ms. Minnieweather did not recall preparing the drawing. He also said that Ms. Minnieweather told him that she had seen the defendant in the club with another man she did not know.
The jury convicted Mr. Blueford of the responsive verdict of aggravated |7battery against Roshonda Vance, but acquitted him on the charge related to Maurice Pitts, who did not testify. As previously noted, the jury also convicted Blueford as charged of possession of a firearm by a convicted felon.
At the habitual offender hearing, the state proved that Blueford was a fourth-felony offender using a combination of official records, fingerprints and expert testimony to prove that Blueford was the person convicted in the prior offenses. The evidence also established that he was a fourth-felony offender for purposes of his felon with a firearm conviction even if the predicate illegal use of weapons conviction was omitted.[4]
At sentencing, the court found a number of aggravating factors regarding the defendant’s conduct, including the likelihood that he would reoffend, the risk of death or great bodily harm to multiple people that he created by firing his pistol into a crowd of people, and his need for custodial treatment. Finding no mitigating factors, the court also examined the defendant’s social history, noting that he had dropped out of school in the seventh grade, and, at age 15, *59 he was incarcerated for simple burglary. The court also noted that the defendant had written the court a letter stating that he had changed his life in recent years, but which denied responsibility for the shooting. Because it found that Blueford had a total lack of respect for the law, and he was a particular danger to society, the court imposed the maximum sentence of life imprisonment at hard labor for aggravated battery, and further imposed a concurrent 65-year hard labor sentence, without parole, for possession of a firearm by a convicted felon. The defendant filed a motion to reconsider sentence, urging that the sentence was excessive. After the court |sdenied that motion, the defendant appealed.
DISCUSSION
By his first assignment of error, the defendant alleges that the evidence adduced was insufficient to support the convictions for aggravated battery and possession of a firearm by a convicted felon. The convictions were based primarily on testimony lacking internal consistency.
In this assignment of error, the defendant contends that the jury’s choice to credit the testimony of Roshonda Vance, Shekeva King and Mark Ramey was clearly wrong because their testimony was internally inconsistent.
The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); State v. Tate, 2001-1658 (La.5/20/03), 851 So.2d 921, cert, denied, 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004); State v. Cummings, 95-1377 (La.2/28/96), 668 So.2d 1132; State v. Murray, 36,137 (La.App. 2 Cir. 8/29/02), 827 So.2d 488, writ denied, 2002-2634 (La.9/05/03), 852 So.2d 1020. This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. State v. Pigford, 2005-0477 (La.2/22/06), 922 So.2d 517; State v. Robertson, 96-1048 (La.10/4/96), 680 So.2d 1165. The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith, 94-3116 (La.10/16/95), |fl661 So.2d 442. A reviewing court accords great deference to a jury’s decision to accept or reject the testimony of a witness in whole or in part. State v. Hill, 42,025 (La.App. 2 Cir. 5/9/07), 956 So.2d 758, writ denied, 2007-1209 (La.12/14/07), 970 So.2d 529; State v. Gilliam, 36,118 (La.App. 2 Cir. 8/30/02), 827 So.2d 508, writ denied, 2002-3090 (La.l1/14/03), 858 So.2d 422.
The Jackson standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. State v. Sutton, 436 So.2d 471 (La.1983); State v. Parker, 42,311 (La.App. 2 Cir. 8/15/07), 963 So.2d 497; State v. Owens, 30,903 (La.App. 2 Cir. 9/25/98), 719 So.2d 610, writ denied, 98-2723 (La.2/5/99), 737 So.2d 747.
Where there is conflicting testimony about factual matters, the resolution of *60 which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. State v. Allen, 36,180 (La.App. 2 Cir. 9/18/02), 828 So.2d 622, writs denied, 2002-2595 (La.3/28/03), 840 So.2d 566, 2002-2997 (La.6/27/03), 847 So.2d 1255, cert, denied, 540 U.S. 1185, 124 S.Ct. 1404, 158 L.Ed.2d 90 (2004).
|TnIn the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness’s testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. State v. Wiltcher, 41,981 (La.App. 2 Cir. 5/9/07), 956 So.2d 769; State v. Burd, 40,480 (La.App. 2 Cir. 1/27/06), 921 So.2d 219, writ denied, 2006-1083 (La.11/9/06), 941 So.2d 35.
As this court explained in State v. Williams, 35,911 (La.App. 2 Cir. 9/18/02), 828 So.2d 180:
When a witness is impeached, this simply means the jury, as the trier of fact, is presented with evidence which it could consider and weigh in determining the credibility, or believability, of a witness. Simply because the witness may have been impeached by prior inconsistent statements does not mean that the jury is prohibited from believing anything said by the witness. The inconsistencies in the witness’s statements are one of any number of factors the jury weighs in determining whether or not to believe a witness’s trial testimony. State v. Dunn, 30,346 (La.App. 2 Cir. 2/25/98), 708 So.2d 512; State v. Bender, 598 So.2d 629 (La.App. 3 Cir.1992), writ denied, 605 So.2d 1125 (La.1992).
There áre some inconsistencies in the testimony of all three of the witnesses complained of. Of the three witnesses in question, the testimony of Mr. Ramey is the most problematic. Before trial, Ra-mey identified Blueford as the shooter and stated that he saw another man get in the vehicle. However, at trial, he recanted his earlier statements to police. He testified that he did not actually see Blueford firing a weapon, nor did he actually see another man get in the truck. Despite these fundamental inconsistencies, Ramey identified the defendant as the driver of the vehicle from which the shots were fired, and he did not actually see another person in the vehicle. This evidence was consistent with the testimony of Roshonda Vance and InShekeva King.
Regarding these two witnesses, the defendant challenges their credibility because they denied having a pre-trial meeting with the district attorney, and Roshonda had previously requested the district attorney drop the charges against Blueford related to her. In the “drop slip” she said that she did not know who shot her. At trial, she explained that she tried to have the charges dropped because she did not believe that Blueford was trying to specifically shoot her. This account does not make her testimony at trial fundamentally unbelievable; ultimately, that decision belonged to the jury. The witness was thoroughly examined on this point, and the jury was able to judge the credibility of her explanation for the inconsistency.
The prior meeting with the district attorney was also thoroughly explored on cross-examination, and, although difficult to reconcile, it did not render their testimony so internally inconsistent to justify upsetting the verdicts. These inconsistencies, which did not concern their testimony regarding the shooting, impact the weight that the jury might choose to give their testimony.
We conclude that, while these inconsistencies in the testimony of the three witnesses are noteworthy, they do not rise to *61 the quality of inconsistency necessary to undermine the jury’s decision to credit their testimony establishing the elements of the offense, including the defendant’s identity as the shooter. Because the evidence was sufficient to prove all of the elements of both of the offenses of conviction, and because the inconsistencies in the witnesses’ statements were insufficient to undermine the jury’s choice to credit their testimony, this assignment of error is without merit.
11gBy his second assignment of error, the defendant contends that it was error for the trial court to deny his objection to comments made by the state during opening statements. Those statements referred to evidence of prior crimes alleged to have been committed by Blueford as to which evidence was inadmissible. During his opening statement to the jury, the prosecutor made the following remarks:
Remember, attempted second degree murder is the attempted killing of a human being when the offender has specific intent. If you shoot into a crowd of people, what are you trying to do? Two people were hit. One was hit in the hand, one in the thigh. The offender is a convicted felon. What is he a convicted felon for? Illegal use of weapons or dangerous instrumentalities. The exact same thing that he is using now to attempt to kill somebody else. Once you’ve heard all the evidence, there is only one verdict — guilty as charged. Thank you.
Defense counsel objected at this point, arguing that by making these remarks, the prosecutor was asserting that the defendant is doing the exact same thing again as though he was charged with attempted second degree murder before, and now he is again charged with attempted second degree murder, which is not the charge that he was convicted of. We object to the opening statement of the state in terms of the insinuation that he had previously been found guilty of attempted second degree murder.
In response, the prosecutor argued that by that statement, he was indicating to the jury that the defendant was using a dangerous weapon again.
After some discussion, the court observed that the underlying felony for the felon with a firearm charge was illegal use of weapons, and that the prosecutor was allowed to refer to that crime because of the felon with a firearm charge in the instant case. The court overruled the defendant’s 11sobjection and noted his objection to the ruling.
On appeal, the defendant argues that the prosecutor’s “insinuation [that] this was not the first time [the defendant] tried to kill someone” was an impermissible, if indirect, reference to other crimes evidence that necessitated a mistrial under La. C. Cr. P. art. 770. The defendant admits that the prosecutor could refer to the previous offense due to its use as the predicate felony to the instant felon with a firearm charge, but he argues that the reference went further and was actually a reference to a prior charge of attempted second degree murder brought against Blueford, a charge that was not successfully prosecuted.
Based on our review of the transcript, we conclude that the prosecutor was not arguing that Blueford had tried to kill someone in the past; rather, he was arguing that Blueford had illegally used weapons in the past and had done so again on the night he shot the two victims at the club. Essentially, the prosecutor was stating that the defendant had illegally used weapons in the past and that makes it more likely that he was doing so during the offenses for which he was charged. *62 Ordinarily, other crimes evidence may be admissible under La. C.E. art. 404 to show pattern or plan, but the use of this evidence typically requires notice and a hearing. In his case, the details of the prior offense were not presented to the jury or used to meaningfully further the prosecutor’s argument.
We conclude that, although the slight ambiguity in the prosecutor’s comment may have, albeit innocently, evaded the spirit of the law restricting the use of other crimes evidence, any error in allowing the remark was harmless beyond a reasonable doubt given the eyewitness testimony by one of |14the victims and her friend placing the gun in Blueford’s hand at the time of the shooting. Additionally, as the trial court found, the jury was entitled to hear about Blueford’s prior offense in conjunction with the felony possession of a firearm charge, and the prosecutor simply chose the illegal use of weapons charge from among Blueford’s many prior convictions as the basis for the felon with a firearm prosecution. This assignment of error does not present reversible error.
By his third assignment of error, the defendant alleges that it was error for the trial court to sustain the state’s objection to defense counsel’s questioning of Shekeva King about pending charges against her.
When the state tendered Shekeva for cross-examination, the first substantive question asked by the defense attorney was “Ms. King, are you presently facing charges?” The prosecutor immediately objected on the grounds that the witness could only be impeached with evidence of her prior convictions, if any, and not with evidence that she was presently facing charges. The defendant urged that he should be entitled to ask about any charges related to Ms. King because “it goes to the weight of testimony in terms of whatever she would change her testimony based on pending charges and any type of beneficial treatment she may receive based upon those particular charges.” The defendant explained that Ms. King had pending charges “going on for quite some time” and that the influence over her held by the state should be known by the jury. The trial court concluded that the defendant could explore the issue of the state’s influence over the witness by asking whether the state had promised her anything in reference to her testimony, thus avoiding the issue of pending charges. When cross-lexaminatíon! B resumed, counsel explored with the witness her contact with the district attorney’s office, and she said that she had not discussed her testimony with the state.
On appeal, the defendant argues that the trial court impermissibly limited his cross-examination of this witness, citing Justice Calogero’s dissent in State v. Marcantel, 00-1629 (La.4/3/02), 815 So.2d 50, which reads, in part:
The record reveals that during the cross-examination of Mark McCauley the defense counsel made a motion, outside of the presence of the jury, that he be permitted to question McCauley concerning his prior arrests and pending charges, in order to show bias. After hearing the arguments, the court denied the defendant’s motion, finding that any questioning pertaining to Mark McCauley’s prior arrests was irrelevant and inadmissible. The court of appeal agreed, finding that La. C.E. art. 609.1 limits impeachment of witnesses to convictions and not arrests or pending charges.
However, the possibility that the State may have “leverage over a witness due to the witness’s pending criminal charges ...” is a valid and permissible area of cross-examination. State v. *63 Rankin, 465 So.2d 679, 681 (La.1985). It is also well-settled that “a witnessfs] hope or knowledge that he will receive leniency from the state is highly relevant to establish bias or interest” (State v. Brady, 381 So.2d 819, 821-22 (La.1980)), and that “a witness’s bias or interest may arise from arrests or pending criminal charges, or the prospect of prosecution, even when he has made no agreements with the state regarding his conduct.” State v. Vale, 95-1280 p. 4 (La.1/26/96), 666 So.2d 1070, 1072.
La. C.E. art. 609.1 provides, in part:
A. General criminal rule. In a criminal case, every witness by testifying subjects himself to examination relative to his criminal convictions, subject to limitations set forth below.
B. Convictions. Generally, only offenses for which the witness has been convicted are admissible upon the issue of his credibility, and no inquiry is permitted into matters for which there has only been an arrest, the issuance of an arrest warrant, an indictment, a prosecution, or an acquittal.
|1fiIn State v. Mays, 612 So.2d 1040 (La.App. 2 Cir.1993), writ denied, 619 So.2d 576 (La.1993):
The possibility that the prosecution may have leverage over a witness due to that witness’s pending criminal charges is recognized as a valid area of cross-examination. State v. Brumfield, 546 So.2d 1241 (La.App. 1 Cir.1989), writ denied, 556 So.2d 54 (La.1990); State v. Smith, 591 So.2d 1219 (La.App. 4 Cir.1991), writ denied, 604 So.2d 995 (La.1992). Criminal charges are considered to be “pending” if the time limitations for institution of prosecution have not elapsed, although the charges have been disposed of. State v. Harrison, 484 So.2d 882 (La.App. 1 Cir.1986), writ denied, 488 So.2d 688 (La.1986); State v. Landry, 583 So.2d 911 (La.App. 1 Cir.1991). LSA-C.E. art. 609.1(B) provides that “[generally, only offenses for which the witness has been convicted are admissible upon the issue of his credibility ...” and that inquiries as to such matters as arrests, indictments, and acquittals are not allowed. However, the accused’s right to cross-examine a state’s witness as to pending charges to show possible bias and prejudice is acknowledged in the Author’s Notes pertaining to this code article found in the Handbook on Louisiana Evidence Law, Pugh, Force, Rault, and Triche (1992). See Authors’ Notes (2) and (6) to LSA-C.E. art. 609.1, the latter of which cites State v. Brumfield, supra, as well as LSA-C.E. art. 607(D) and its Author’s Comment (12). Also, see and compare Official Comment (d) to LSA-C.E. art. 609, which applies to civil cases.
In Mays, this court concluded that the trial court erred in refusing the defendant the opportunity to cross-examine the witness “about any deals he might have made with the state as to his prior arrests in exchange for his testimony,” but concluded that the error in that case was harmless because of the overwhelming evidence of the defendant’s guilt.
In this case, the trial court did not allow the defendant to ask Shekeva King specifically about her arrest or pending charges, but allowed the defendant to ask whether the state had promised her anything in exchange for her testimony. The law discussed above provides exceptions to the general 117rule forbidding questions about arrests. We believe that the trial court’s ruling was arguably too restrictive of the defendant’s right to question this witness about the possibility of influence held over her by the state. On the other hand, since the trial court did not entirely foreclose *64 this avenue of questioning by allowing the defense to question her whether she had been promised anything in exchange for her testimony, and since she was not the only witness that identified the defendant as the shooter, we conclude that any error in this ruling was harmless beyond a reasonable doubt.
In his fourth assignment of error, the defendant contends that the habitual offender sentences of life plus 65 years, even though ordered to be served concurrently, were excessive under the facts and circumstances of this case.
Appellate review of sentences for exces-siveness is two-pronged. First, the record must show that the trial court considered the criteria of La. C. Cr. P. art. 894.1. The sentencing court is not required to list every aggravating or mitigating circumstance so long as the record reflects that it adequately considered the guidelines. State v. Smith, 433 So.2d 688 (La.1983); State v. Quiambao, 36,587 (La.App. 2 Cir. 12/11/02), 833 So.2d 1103, writ denied, 2003-0477 (La.5/16/03), 843 So.2d 1130.
The second prong is constitutional ex-cessiveness. A sentence violates La. Const, art. 1, § 20 if it is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless and needless infliction of pain and suffering. State v. Dorthey, 92-3120 (La.9/10/93), 623 So.2d 1276; State v. Bonanno, 384 So.2d 355 (La.1980). A sentence is deemed grossly disproportionate if, when the crime and punishment are viewed in light of the |1Rharm done to society, it shocks the sense of justice or makes no measurable contribution to acceptable penal objectives. State v. Guzman, 99-1753 (La.5/16/00), 769 So.2d 1158.
As a general rule, maximum or near maximum sentences are reserved for the worst offenders and the worst offenses. State v. Woods, 41,420 (La.App. 2 Cir. 11/1/06), 942 So.2d 658; State v. Brisco, 33,179 (La.App. 2 Cir. 4/5/00), 756 So.2d 644, writ denied, 2000-1478 (La.5/25/01), 792 So.2d 749.
The penalty for aggravated battery in 2011 was imprisonment with or without hard labor for not more than 10 years and/or a fine of not more than $5,000. La. R.S. 14:34. The penalty for possession of a firearm by a convicted felon was imprisonment at hard labor for not less than 10 years, nor more than 20 years without probation, parole or suspension of sentence and a fine not less than $1,000 and not more than $5,000. La. R.S. 14:95.1.
La. R.S. 15:529.1 provided, in part:
A. Any person who, after having been convicted within this state of a felony, or who, after having been convicted under the laws of any other state or of the United States, or any foreign government of a crime which, if committed in this state would be a felony, thereafter commits any subsequent felony within this state, upon conviction of said felony, shall be punished as follows:
[[Image here]]
(4) If the fourth or subsequent felony is such that, upon a first conviction the offender would be punishable by imprisonment for any term less than his natural life then:
(a) The person shall be sentenced to imprisonment for the fourth or subsequent felony for a determinate term not less than the longest prescribed for a first conviction but in no event less than twenty years and not more than his natural life; or
119(b) If the fourth felony and two of the prior felonies are felonies defined as a crime of violence under R.S. 14:2(B), a sex offense as defined in R.S. 15:540 et seq. when the victim is *65 under the age of eighteen at the time of commission of the offense, or as a violation of the Uniform Controlled Dangerous Substances Law punishable by imprisonment for ten years or more, or of any other crime punishable by imprisonment for twelve years or more, or any combination of such crimes, the person shall be imprisoned for the remainder of his natural life, without benefit of parole, probation, or suspension of sentence.
Blueford’s prior convictions include:
—Two convictions for simple burglary of an inhabited dwelling, both of which were entered by a guilty plea on the same day in 1997;
—Conspiracy to commit simple burglary and attempted simple burglary in 2000, again entered by guilty plea on the same day;
—Distribution of false CDS in 2000;
—Illegal use of a dangerous weapon, 2003.
Among these offenses, only the convictions for simple burglary of an inhabited dwelling were punishable by sentences of 12 years or more, and the drug offense was punishable by a maximum sentence less than 10 years. Of the two instant crimes, only aggravated battery was a crime of violence under La. R.S. 14:2(B). However, Blueford has two prior convictions for crimes punishable by imprisonment for 12 years or more. Except for the effect of a 2005 amendment to the habitual offender law, his sentence for aggravated battery would have been imposed under La. R.S. 15:529.1(4)(b), i.e., life without parole.
Prior to 2004, the rule was that multiple convictions on the same day could be used only as one predicate offense. State ex rel. Mims v. Butler, 601 So.2d 649 (La.1992). In 2004, the supreme court decided that rule was inj^error and reversed it, declaring that multiple convictions entered on the same day could individually be used as predicates. State v. Johnson, 2003-2993 (La.10/19/04), 884 So.2d 568. In 2005, the legislature changed the law to clarify its intent, see State v. Spano, 41,032 (La.App. 2 Cir. 8/1/06), 936 So.2d 304, and in 2011, La. R.S. 15:529.1(B) provided in part:
Multiple convictions obtained on the same day prior to October 19, 2004, shall be counted as one conviction for the purpose of this Section.
Because Blueford’s two convictions for simple burglary of an inhabited dwelling were entered on the same day prior to 2004, they can only be counted as one conviction. Accordingly, the district court correctly imposed the sentence for both offenses under La. R.S. 15:529.1(A)(4)(a).
The trial court very thoroughly considered the La. C.C.P. art. 894.1 factors in choosing the defendant’s sentences. The defendant has persistently been involved with crime since he became an adult, and in this most recent offense, he created a substantial risk of death or great bodily harm to numerous people by firing a handgun indiscriminately into a crowd of people. The trial court’s conclusion that Blue-ford was a “particular danger to society” is well-supported by the record which supports the maximum sentence for aggravated battery. We find no merit in this assignment of error.
This court afforded the defendant additional time to file a pro se brief in which he raises two assignments of error, which we now consider.
In his first pro-se assignment of error, the defendant alleges that since he was entitled to have 12 jurors deliberate, the trial court erred in failing to order a mistrial when one of the 12 jurors, Ms. Massey, reported she had not |⅞1 heard any of the evidence and could not participate in deliberations. Further, since the jury poll *66 showed a 11-1 vote, i.e., a non-unanimous vote, the defendant contends by his second assignment that the conviction is unconstitutional. La. C. Cr. P. art. 782; LSA. Const. Art. 1, § 17, and the Fifth, Sixth and Fourteenth Amendments to the Constitution.
The defendant’s assignment concerns an uncommon pre-verdict situation involving one of the juror’s ability to hear the trial proceedings. After the conclusion of trial and the jury instructions were given, the judge excused the 12-person jury and held back the 2 alternates, whom he then excused. After a recess, court reconvened on the record, and this exchange occurred:
Court: Let’s return to the record in the State v. Joseph Blueford, 11-14F. The defendant is present with counsel. The state is also present. Madam Bailiff has handed me a note from the jury. It reads: “Your Honor, a juror Ms. Massey has said that she has not heard and has not understood anything that was said in trial and she is wondering what to do. Shouldn’t you have an alternate juror?” That is the question.
Mr. Sylvester: Too late for that.
Mr. Britton: We cannot have an alternate juror.
Mr. Sylvester: That’s right.
Court: The last question is should Ms. Massey be excused or allowed to go on with deliberations?
Mr. Britton: I mean, I don’t know. If they have ten, they have ten verdicts, regardless of what Ms. Massey has to say. So I don’t think she should be excused. But if they don’t have a verdict, they don’t have a verdict, you know, whichever Ms. Massey goes.
Court: So at this time it would be the pleasure of counsel not to excuse her from any jury deliberations?
lagMr. Britton: That’s right.
Mr. Sylvester: Yes, sir.
Court: All right.
Mr. Britton: I think if we look at it this way in terms of the jury, we go in that courtroom and talk to a witness, there should be a speaker behind the jury box or something like that.
Court: I would like to explain to them that once the deliberations start, the ju-alternates are dismissed.
At this point, the jury was brought back into the courtroom.
Court: Members of the jury, before the proceedings, a note was submitted to the bailiff. The note reads: “Your Honor, the juror Ms. Massey said that she has not heard and does not understand anything that’s been said in the trial. She doesn’t know what to do. Should we have an alternate juror?” Let me advise you that under the Code of Criminal Procedure once the jury begins jury deliberations, the two alternates are excused. I’d also like to remind you that the provisions or charge still say that at least ten of you must agree on the same verdict on each count. It requires ten of the twelve agreeing on each count. So that is my response to you. I don’t know how many we addressed everyone here and asked them to repeat, and no time was there any indication that Ms. Massey was having a problem. So I’d encourage you to go back and resume your deliberations.
After the jury asked some additional legal questions that the judge answered, the jurors returned with their verdicts. Defense counsel requested polling, and the judge said:
All right. Let me see the verdict form. Members of the jury, at this time the clerk will hand you a slip of paper. It asks that you sign your name and to *67 note whether or not this was your verdict on each of these counts. Please, follow the instructions on the sheet and then we’ll count those to make sure that we have ten votes on each count. We have one slip that’s not signed. Did someone forget to sign their slip? Please, have the juror sign this piece of paper and complete the slip. Ma’am, you’ll need to Incomplete the slip of paper. The record should reflect the polling slips show the requisite number of votes for each count to be in compliance with the law. Therefore, we’ll let the verdict form be filed, as well as the polling slips.
The record on appeal does not reflect the name of the juror who did not initially complete the polling slip. Also, because the polling slips were filed by the district court clerk, but were not included in the appellate record, we obtained the slips for incorporation into the record. On count one (aggravated battery), the vote was 10-2. On count two (the acquittal), the vote was 10-2. On count three (felon with a firearm), the vote was 11-1. Ms. Massey voted with the majority on all three ballots.
In his appellate brief, the defendant argues that he was entitled to be tried by a jury of 12 persons, yet he was tried by a jury of 11 persons, which is illegal under, inter alia, La. Const, art. 1, § 17 and La. C. Cr. P. art. 762.
Our review of the record indicates that, at the outset of voir dire, the trial judge gave the jurors some general information and guidelines. The judge stated:
Also, let me ask you this, if at any time you cannot hear what is being said in this courtroom, because of the way this is designed — it’s a beautiful courtroom but the acoustics are very hard to hear when someone is speaking. If at any time you cannot hear what is being said in this courtroom, let me know immediately. Sometimes in a ease that goes on a couple of days, a juror may ask, “Well, Judge, can you replay so and so’s testimony?” I am not allowed. The law does not allow me to replay testimony. So, if you have a witness on the stand and you didn’t hear what they said, let me know immediately so I can ask the attorney to ask the question again so that you can hear their response. It’s very important that you be able to hear what is happening in this courtroom. After all you are being asked to deliberate on a person’s liberty, whether they are going to jail. So, it is important that you be able to hear and understand what is going on.
| abater, the judge queried the jurors as a group about their qualifications, and one of the judge’s questions was:
You must not be under interdiction or incapable of serving because of a mental or physical infirmity. Do each -one of you meet this qualification?
The record reflects that all of the jurors answered yes upon the judge’s second query.
When the prosecutor began questioning the jurors, he opened his questions with these remarks:
As the Judge said, please tell me if I’m not speaking loud enough. I think I’m speaking loud enough, but I’m right here in front of the microphone. Last week, we were doing this and I thought I was talking loud enough, but people kept saying, “Judge, we can’t hear him. We can’t hear him.” So, please, I want you all to hear everything that I have to say. Not everything that I say is important, but I would like for you to hear it.
The prosecutor then questioned several jurors during voir dire. Ms. Helen Massey did not initially understand his first *68 question, which had to be repeated, but she was thereafter able to understand the prosecutor’s questions. During subsequent questioning by the prosecutor, Ms. Massey explained that she had served on a criminal jury in the past, and that this jury acquitted the defendant because the state failed to carry its burden of proof. At the conclusion of voir dire, Ms. Massey was selected to serve on the jury as a principal (not an alternate) juror during the trial.
In general, the record reflects that everyone, including the judge, had a little trouble hearing in the courtroom. For example, the court stated on one occasion: “Repeat that again. Your speech is trailing out. It’s hard to hear in this area.” On another occasion, the judge said, “I can’t hear you, Mr. | ^Britton.” On at least one other occasion, a juror spoke out that he could not hear a witness’s response to a question, which was repeated.
After trial and jury instructions, the jury was sent to deliberate and the alternates were excused. Only then did Ms. Massey inform the bailiff that she had been unable to hear the proceedings, and upon that discovery, the trial court presented the matter to counsel as noted above. The defendant’s attorney made the deliberate choice to proceed with deliberations without objection or a request for additional procedures, such as a hearing to determine what testimony was missed. Of course, trial errors are not reviewable on appeal in the absence of an objection, La. C. Cr. P. art. 841, and in this ease, the defendant’s attorney not only did not object, he chose to proceed.
We have found no Louisiana cases on this particular issue. The issue has arisen in other jurisdictions. Closely analogous to the instant case is People v. Trevino, 826 P.2d 399 (Colo.Ct.App. Div. Ill 12/5/1991), where the jury sent a note to the judge during deliberations informing him that one juror had not heard much of testimony presented on the second day of trial because she had forgotten her hearing aid. The court denied defense counsel’s motion for a mistrial, finding that the error was harmless because the evidence against the defendant was overwhelming. On appeal, the appeals court disagreed, holding that the defendant’s state constitutional right to trial by a jury of 12 was violated when one juror forgot her hearing aid on the second day of trial and was unable to hear the testimony. The court concluded that the juror’s inability to hear a substantial portion of the testimony was pervasive and required that the defendant be granted a new trial. It said the 12r,effect of the juror’s inability to hear the testimony was tantamount to the juror not being in attendance for more than one-third of the trial, thus denying the defendant the right to a jury of 12. See also, Commonwealth v. Greiner, 309 Pa.Super. 291, 455 A.2d 164 (Pa.Super., 1/21/1983); Commonwealth v. Brown, 231 Pa.Super. 431, 332 A.2d 828 (1974).
However, in the instant case, defense counsel did not move for a mistrial, nor did he raise any objections after discovering Ms. Massey did not hear any testimony prior to a verdict. In Roberts v. State, 4 Md.App. 209, 241 A.2d 903, 905 (1968), prior to opening argument, two jurors responded to the judge’s questions by indicating that they had difficulty with their hearing, but promised they would notify the judge if they did not hear testimony. Both the prosecution and defense made no objection and agreed to allow the two jurors to serve on the jury. The appellate court held that the defendant waived the right to object to the jurors after the verdict was rendered. Similarly, in Lindsey v. State, 189 Tenn. 355, 225 S.W.2d 533, 15 A.L.R.2d 527 (1949), the Tennessee Supreme Court held that a defendant con *69 victed of murder had waived any objection as to a juror’s partial deafness by the failure to raise any objection before the verdict, since he knew of the partial deafness prior to the verdict.
Because defense counsel was informed of Ms. Massey’s difficulty hearing prior to rendition of a verdict but raised no objection, we conclude that the defense waived the right to object to the verdict on grounds that no contemporaneous objection was raised at trial prior to a verdict. La. C. Cr. P. art. 841. This ruling does not foreclose the possibility of raising this issue on post-conviction relief where the record can be more fully developed.
127The second part of this assignment concerns the defendant’s conviction by a non-unanimous jury. The defendant contends that his convictions of aggravated battery and felon in possession of a fee-arm by a non-unanimous jury were unconstitutional, violating LSA Const. Art. 1, § 17, and the Fifth, Sixth and Fourteenth Amendments to the Constitution.
We have considered this issue in the past. Only two states, Louisiana and Oregon, permit felony criminal convictions by a non-unanimous jury. However, it remains settled law in this state. La. C. Cr. P. art. 782(A) provides, in part, that “Cases in which punishment is necessarily confinement at hard labor shall be tried by a jury composed of twelve jurors, ten of whom must concur to render a verdict.” The Louisiana Supreme Court has upheld the constitutionality of this rule; see State v. Bertrand, 2008-2215 (La.3/17/09), 6 So.3d 738, and as recently as 2013, the United States Supreme Court has declined to review the practice. State v. Miller, 10-718 (La.App. 5 Cir. 12/28/11), 83 So.3d 178, writ denied, 2012-0282 (La.5/18/12), 89 So.3d 1191, certiorari denied sub nom. Miller v. Louisiana, — U.S. —, 133 S.Ct. 1238,185 L.Ed.2d 177 (2013).
Because the Louisiana Supreme Court has spoken in Bertrand and because this appears to be settled law for now, this assignment of error is without merit.
CONCLUSION
For the reasons stated, we affirm the defendant’s convictions and sentences.
CONVICTIONS AND SENTENCES AFFIRMED.

. Peoples did not testify; he died prior to trial.

. Pitts, whom the officer called Marcellus, did not testify at trial, and his first name is alternately given as Maurice in other parts of the record.

.The defendant was later charged with attempted second degree murder of both victims.

. See State v. Baker, 2006-2175 (La. 10/16/07), 970 So.2d 948.